Fred C. WERNENTIN, Esther Wernentin, Robert L. Jester and Bobette Jester, Plaintiffs,

v.

The UNITED STATES of America, Defendant.

Civ. No. 1–528.

United States District Court
S. D. Iowa,
Davenport Division.

April 30, 1963.

16. United States v. Barrios, 124 F.Supp. 807 (S.D.N.Y.1952).

John C. Owen, Washington, Iowa, for plaintiffs.

John Hammerman, Tax Division, U. S. Dept. of Justice, Washington, D. C., for defendant.

VAN PELT, District Judge.

This is a suit to recover federal income taxes alleged to have been erroneously paid and collected for the calendar years 1951, 1952 and 1953. Plaintiffs are members of a partnership known as Wernentin and Jester.

The central issue presented is the same as was involved in a series of cases to be discussed herein, namely, whether payments made to the taxpayers pursuant to an agreement whereby they granted to another rights to the use of a patented machine and a trade name in described territories constituted ordinary income resulting from licenses or capital gain resulting from sales. The product involved in these cases is Dairy Queen, a soft-serve dairy product drawn from a machine and served directly to the customer. The machine produces the product and serves it in a semi-frozen condition.

Robert L. Jester, hereinafter referred to as Jester, was the only witness at the trial. He is a member of the partnership mentioned above. His testimony reveals much of the background of the controversy. Jester during 1948 contracted for certain patent and trade name rights for the State of New Jersey from H. A. McCullough and J. F. McCullough. This contract (Exhibit A attached to the complaint) granted Jester the right to the use of patented freezers and the name Dairy Queen within New Jersey, and the right to subdivide the state among subcontractors. Although this contract did not specify that Jester's rights were exclusive, Jester testified that it was understood by the parties that they were to be exclusive, and since the date of the contract, Jester has had these rights exclusively except for the rights of Robert U. Dinkins, the individual who obtained the New Jersey rights from Jester and those to whom Dinkins has granted such rights.

By a contract entered into May 5, 1949 (Exhibit B attached to complaint) and further contracts of Feb. 1, 1950, Aug. 1, 1950, Feb. 1, 1951, July 16, 1951 and May 5, 1951 (Exhibits C, D, E, F, and G attached to the complaint) Jester conveyed certain rights to develop all of New Jersey to Dinkins.

These contracts conveyed certain rights and imposed certain duties and restrictions on each of the parties. The rights conveyed to Dinkins included the right:

1) to purchase and operate the patented freezers,

2) to establish Dairy Queen stores,

3) to use the Dairy Queen name,

4) to subcontract areas within the territory, subject to the primary contract between Jester and Dinkins and to Jester's prior written approval. In the subcontracts Dinkins could "charge a maximum of $2000 for the rights to operate under a subcontract and a maximum of 29 cents per gallon on all mix used "

5) to require that Jester refrain from granting any New Jersey rights to anyone else,

6) to require Jester to take up the matter of adjustments with respect to defective freezers.

Obligations assumed by Dinkins included covenants:

1) not to move freezers outside the territory,

2) to order freezers through Jester at a cost not exceeding the manufacturer's price f. o. b. the factory,

3) to pay Jester $333.33 on the starting date of the first three stores and $1,000.00 on the starting date of each additional store, and 19 cents per gallon on all mix used in the stores within the territory,

4) to keep records of all mix used or sold within the territory and of the freezers in which the mix was used; the seller, the patentee (Ar-Tik Systems, Inc.) and H. A. McCullough are given free access to the records to determine sums owed them,

5) to sell only Dairy Queen unless written permission from Jester to sell other products was obtained, and to use no other types of freezers without Jester's approval; Dinkins also agreed not to sell any freezers without Jester's written consent,

6) to purchase only high grade mix and supplies,

7) to make every effort to have at least three stores operating in the territory by Oct. 1, 1949; if he failed to do this, then, at Jester's option, Dinkins would lose his rights to further develop the territory. Dinkins complied with this requirement. It was also provided that the rights of the buyer to operate under the agreement continue only for areas under subcontract and areas within a two mile radius of a store operated by Dinkins.

Another freezer and territory agreement entered into on May 5, 1951 is like the 1949 agreement except that the royalty per gallon is increased to 21½¢ and the following provision is substituted for original paragraph 10, the substance of which is above set forth as paragraph 7.

"10. THAT the buyer shall make every effort to secure the establishment of Dairy Queen stores within the above described territory at desirable locations until said territory has been fully developed. In the event the Buyer defaults in his performance of the terms, conditions and provisions of this agreement, and the Seller desires to exercise his right to extinguish the Buyer's rights to further develop the above described territory, the Seller shall furnish the Buyer with NINETY (90) DAYS written notice by registered mail to the address herein given, notifying the Buyer of the termination of said rights."

This agreement granted to Dinkins rights to all portions of New Jersey not theretofore granted.

The examination of Jester, both on direct and cross, attempted to establish his actions in connection with the New Jersey operation after the contracts with Dinkins had been entered into. On direct examination Jester also explained the reasons for inserting various provisions in the contract. From the direct examination it appears that after the contract with Dinkins, Jester had nothing to do with negotiation of the subcontracts, nor did he thereafter convey any Dairy Queen rights in New Jersey to anyone. Jester provided Dinkins with a formula for the mix, at Dinkins' request, but never required him to use that formula. Jester did not exercise the right of audit which the contract provided for. Nor did he ever refuse to approve a subcontract submitted by Dinkins. Contrary to the terms of the contract, Dinkins would execute subcontracts before obtaining Jester's approval, and Jester would approve them after they had been so executed. Jester's approval was neither asked nor given when an individual operator wanted to sell his Dairy Queen store and rights. In all such cases it was Dinkins who gave the approval. Jester furnished, at Dinkins' request, blue-

prints for Dinkins' first store, but never required Dinkins to use the blueprints.

Jester's explanation of paragraph 12 of the contract requiring the purchase of high grade mix was that such provision was intended to protect Dairy Queen rights by keeping quality high, and that standards were necessary to obtain uniformity. Similarly, the provision preventing freezers from being sold or moved out of the territory was to protect other operators. The explanation of that part of the contract which provided that only Dairy Queen could be sold was that Dairy Queen was a specialty product and as such, other items had to be restricted so as not to detract from the specialty. The provision requiring Jester's approval of subcontracts was included to insure that there would be no conflict of territorial rights. The requirement that gallonage payments made by the individual operators should not exceed 29¢ a gallon was inserted to insure that these operators would make a profit, and this method is used around the country.

On cross-examination Jester testified that he never gave Dinkins permission to take any patented freezers outside New Jersey. He never allowed Dinkins to collect more than $2,000 or 29¢ per gallon nor did he excuse him from keeping records and submitting reports. On two occasions he allowed Dinkins to sell products other than Dairy Queen or to authorize such sales. Dinkins was never allowed to use any other type of freezer or to use a mix that was not high grade. The only right Jester had under the contract which he did not exercise was the right to approve subcontracts before they were entered.

Jester's testimony on cross-examination also revealed that he was somewhat active in the operation of the New Jersey enterprise. He sent a newsletter to the individual operators, attended statewide meetings there, and made a couple of trips a year to New Jersey. Jester insisted that most of his New Jersey activity was done at Dinkins' request, and that it was done mainly to help Dinkins

out, although Jester did admit that he hoped that his efforts resulted in additional sales in New Jersey, and that such additional sales helped him financially. Jester testified that he had practically no contact with the individual operators at their stores, but did meet them at statewide meetings. During the period 1951–1953 Jester spent about five hours a week on the average on the New Jersey operation in addition to his trips there, but explained that the collection of money under the contract took some time. Jester says Dinkins requested his presence at the statewide meetings. He says that the items he inserted in the newsletter were materials which Dinkins requested him to include, and statewide included items in the area of exercise of control over the New Jersey stores. On trips made to New Jersey Jester would stay about four or five days, and usually went to Dinkins' house where they would confer on various items and problems, work out programs for the state meetings and discuss generally how things were going. It was also developed that Jester acted as master of ceremonies at the statewide meetings.

The government introduced copies of original and amended partnership returns for the years 1951–53. The amended returns deducted from the amount of ordinary income originally reported the net receipts of the New Jersey operation and claimed such receipts as long term capital gain. The "Statement of Receipts from Sale of New Jersey Contract" attached to the amended returns deducted from total receipts a variety of expenses for legal work, travel, advertising, accounting work, telephone, his office depreciation, etc. Jester explained on cross-examination that these expenses were incurred because Dinkins requested these things to be done, but that he (Jester) felt that these expenses contributed to sales in New Jersey.

The government introduced in evidence the deposition of Dinkins. Dinkins' testimony showed generally the extent of Jester's participation in the New Jersey operation, and the rights of each of the

parties under the contract. Dinkins testified that he never thought of the contract as a "buying and selling deal" despite the references in it to "buyer" and "seller"; however, he also testified that he understood that he acquired from the contract the exclusive right to develop New Jersey. Jester testified, on cross-examination, that he intended to transfer and relinquish substantially all his rights in the development of the trade name and patent rights in New Jersey.

Section 117(q) of the 1939 Internal Revenue Code which is substantially the same as Section 1235 of the 1954 Code provides in part:

"(1) General Rule.—A transfer (other than by gift, inheritance, or devise) of property consisting of *all substantial rights* to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a captial asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are—

"(A) payable periodically over a period generally coterminous with the transferee's use of the patent, or

"(B) contingent on the productivity, use, or disposition of the property transferred." (emphasis supplied)

This section has been construed to cover cases such as the one at bar where patent and trade name rights are involved.

Three of the cases which have dealt with this problem as it relates to Dairy Queen cases have held that the revenue from the transfer of these rights should be treated as long term capital gain because the taxpayer had transferred all his substantial rights. See Dairy Queen of Oklahoma v. C. I. R., 10 Cir., 250 F.2d 503; Gowdey's Estate v. C. I. R., 4 Cir., 307 F.2d 816; and Moberg v. C. I. R., 5 Cir., 305 F.2d 800. Moberg v. C. I. R., 9 Cir., 310 F.2d 782, held that all except one of the types of contracts involved failed to transfer all substantial rights to the patent and trade name and were therefore mere license agreements which generated ordinary income. One type of contract was held a sale generating capital gains.

An analysis of each of these cases is appropriate. It should be noted that the patent and trademark rights involved in all these cases belonged exclusively at one time to the McCulloughs from whom Jester acquired his rights.

The reasons for the holding in Dairy Queen of Oklahoma, supra, may be summarized as follows: Transfer of the patent itself or a part thereof is not essential to a sale; it is enough that the right to the use of the patent in a given area be granted. If "the proprietary right in the franchise" is reserved to the grantor it is a license. We are to determine this by asking ourselves whether the grantee is given the "power to exclude others," that is, whether he has "actual command of the property" irrespective of "refinements of title". (250 F.2d 506) Restrictions of the franchise with respect to " * * * maintenance of quality; sanitary dispensing conditions; design of stores; right to audit the books; approve source of 'mix'; and cancellation for violation of such requirements, were all intended to insure uniform standards for the trade name product sold statewide," and are not fatal to a finding of sale of a capital asset. The grantee had the power to exclude others as long as these requirements were complied with. The named requirements "were designed to protect and safeguard the respective rights of the parties. They were not intended to reserve to the grantor any property or proprietary right in the exclusive and perpetual franchise." (250 F.2d 506) It is of little importance whether the parties call the transaction a sale or a license.

The reasons for the holding in Gowdey's Estate v. C. I. R., supra, may be summarized as follows: The use of the patent and trade name could be transferred independent of title and was of substantial value to the grantee since he could employ it to produce income. His

rights were enforceable at law and carried the power, subject to certain restrictions perpetually to exclude the grantor and others from the same rights within the designated territory. The court analogized "all substantial rights" to a fee in an easement in realty and to an absolute estate in personalty. As is the case with the transfer of realty, reasonable restrictions can be placed upon the privileges without rendering the transaction a license. The court concluded that the restrictions contained in the agreement were necessary to protect the machine, product and name and were consistent with the absolute right to the use of the machines and the method of payment and do not effect a retention by the transferor of any substantial rights in the privileges assigned. The court said that this is true with respect to some restrictions even more stringent than those found in the first Jester-Dinkins contract. The court found more difficult the provision prohibiting assignment without the grantor's consent, but concluded that it did not prevent a finding of sale. At p. 820 of 307 F.2d the court said:

"A predominant factor in our determination—that the Franchise Agreement accomplished a sale—is that the privileges were transferred in perpetuity. An obvious indicium of an absolute estate, it would be paradoxical in a lease or license. Of course, to trace too nice distinctions of estate would be to engage in 'refinements of title' and we are taught they have no place in taxation. [Citations omitted] But we are persuaded further by the broad view of the practical aspects of the problem related in the opinion and decision of the Tenth Circuit in Dairy Queen of Oklahoma v. Comm'r., 250 F.2d 503 (10 Cir. 1957)."

The gallonage payments were said not to be part of the consideration for the transfer of the franchise rights and thus not entitled on the reasoning of the opinion to capital gain treatment.

The Fifth Circuit Court of Appeals opinion in Moberg v. C. I. R., supra, involved contracts which the court for purposes of discussion divided into four categories. The restrictions found in each type were in some degree different. The court, after discussing Dairy Queen of Oklahoma, supra, Gowdey's Estate, supra, and Schmitt v. C. I. R., 9 Cir., 271 F.2d 301, which will be discussed in connection with the Ninth Circuit Court of Appeals Moberg opinion, held that the transactions were sales and generated capital gain and not ordinary income. The restrictions were said to be

"* * * designed to maintain quality, sanitary dispensing conditions, uniform standards for the trade named product, protect each subfranchise purchaser as against other purchasers in respect to territory, protect the seller in respect to the contract with the McCulloughs * * *, and to insure the ascertainment and collection of contractual sums due by way of fixed prices and royalties. * * * [and] were consistent with a sale of the franchise to use the machine and trademark in an exclusive territory." (310 F.2d 806)

The opinion goes on to say that the traditional test of ownership—power to exclude others—had been met and that there was sufficient command over the property in the grantees irrespective of refinements of title. The court specifically pointed out that provisions prohibiting unlimited assignment and providing for termination upon default (presumably of any of the grantee's obligations under the contracts) do not reduce the transaction to a license. The latter provision was said to be a condition subsequent and consistent with a sale.

The court was unable to determine whether the gallonage royalty payments were part of the sales price for the franchise rights and was therefore unable to decide whether they too were entitled to capital gain treatment.

The Ninth Circuit Moberg opinion, supra, held that with respect to all but one

of the types of contracts described in the Fifth Circuit Court of Appeals opinion the taxpayer had not transferred "all substantial rights" and therefore the revenue received therefrom was to be taxed as ordinary income. With respect to the "ten-paragraph agreement", referred to by the Fifth Circuit Court of Appeals as the "eleven agreements", the court said:

"The controls retained by the grantors in substance serve primarily to assure that the agreed consideration in the form of the fixed price and subsequent royalty payments would be paid on time and in the proper amounts." (310 F.2d 783)

With respect to the requirements of sanitation and repair the court said that they " * * * can hardly be said to detract significantly from grantees' prerogatives of ownership in light of the control of the conduct of their businesses transferred to them by the other provisions of the contracts." (Footnote 1) The court went on to say that these restrictions are enforceable only by the power to terminate the franchise, " * * * and did not subject grantees to the possibility of piecemeal future intervention by and at the will of the grantors. Provisions for total forfeiture for nonperformance of conditions are not per se inconsistent with the passage of ownership * * *." (Footnote 1) The importance which the court attaches to the fact that with respect to most of the provisions in the condemned contracts, the grantor had imposed " * * * restrictions upon the purchasers [which] were not fixed by contract, but remained to be determined from time to time by the grantors under a continuing power to make policy determinations in these respects." (310 F.2d 784) is shown by the third paragraph on page 784 of 310 F.2d. The court made it clear that they did not decide the effect of provisions which were not of that nature. It is also clear that the court relied primarily on Schmitt, supra.

In Schmitt, supra, the taxpayer had developed an automatic, mechanical process or accounting method; subsequently he transferred certain rights to its use in certain territories. For several reasons the Schmitt case, which was heavily relied on in the Ninth Circuit Court of Appeals Moberg opinion, is distinguishable from the instant case.

In view of the fact that the patent involved there was primarily a procedure or method patent and was much more intrinsically involved than it is in the instant case, the court in Schmitt placed significance on the fact that the taxpayer had not granted in express terms the right to make, use, and vend the patented product as is generally required of a transfer of patent rights whose proceeds are to receive long term capital gain treatment under Sec. 1235. Because the rights involved in the case at bar are further removed from the patent itself, the problem which bothered the court in Schmitt is not present here.

Also, in Schmitt the grantee was required to district the franchised area within thirty days of the grant and to transfer, subject to the taxpayer's unlimited veto, a minimum number of subfranchises. As may be clearly seen this is a right much more substantial than any reserved in the 1949 Jester-Dinkins contract. Another factor inconsistent with the grant of all substantial rights to the Schmitt patent was the taxpayer's statement, after he had made some prior territorial assignments similar to the one in issue, that he was " * * * 'the *sole* owner of the *entire* right, title and interest in and to those certain U. S. Patents * * *.' " Another important reason stemmed from the fact that for the rights granted to be placed in operation it was necessary to use in conjunction a certain unit the title and rights to which remained in the taxpayer. It is also important to note that even in view of these retentions and restrictions the court considered the case a close one.

In deciding whether Jester transferred all his substantial rights to the use of the patent and trade name, it is of course necessary to discover just exactly what rights he had received from the McCulloughs. Most of the restrictions contain-

ed in the Jester-Dinkins contracts were required directly or indirectly by the McCullough-Jester contract. With respect to these provisions, it is illogical to say that Jester did not transfer but rather retained rights he never had.

Certain rights and restrictions will be made the subject of specific comment. The others were included to make certain that the agreed compensation would be paid on time and in proper amounts, to maintain quality, and uniform standards for the trade named product, to protect each subfranchise purchaser as against other purchasers in respect to territory, to protect the seller in respect to the contract with the McCulloughs, and generally to protect the machine, the product and the name. None of these motives have been characterized by the courts which have dealt with the problems as sufficient to reduce a sale to a license; on the contrary, it has been said that similar restrictions thus motivated do not have that effect.

With reference to the provision requiring the seller's approval of subfranchises, a provision which has bothered some of the courts, and I refer especially to Gowdey's Estate, it should be noted that Jester never refused approval and in several instances was not even contacted until after the subfranchise agreement had been executed at which time he registered his approval.

■ Paragraph 10 of the 1949 Jester-Dinkins contract provides that if Dinkins failed to have at least three stores operating by October 1, 1949, approximately five months after the contract was executed, Jester could declare a forfeiture of Dinkins' rights to further develop the territory. The paragraph also states that the "rights of the Buyer to operate under this agreement shall continue only for the areas under subcontract, plus areas within a two mile radius of any store or stores which the Buyer may own himself." Even the Ninth Circuit Court of Appeals opinion in Moberg, upon which the government relies so heavily, recognized that clauses providing for even total forfeiture for nonperform-

ance of conditions are not per se inconsistent with a sale. Reading this in context it is plainly inferable that what is condemned is the power to terminate at the whim of the seller as distinguished from the power to terminate upon certain described conditions. The Eighth Circuit has adopted the same rule. See Wing v. C. I. R., 278 F.2d 656, 659–661. To the same effect see Young v. C. I. R., 2 Cir., 269 F.2d 89; Magnus v. C. I. R., 3 Cir., 259 F.2d 893. This rule is also implicit in Dairy Queen of Oklahoma, Gowdey's Estate, and the Fifth Circuit Court of Appeals opinion in Moberg.

In this connection it is also important to note that the rights granted to Dinkins could continue in perpetuity providing Jester did not declare a forfeiture under his right to do so as has been heretofore discussed. This factor has been emphasized by the cases and contrasted with temporary grants such as those for a period of years. This was said to be a "predominant" factor in Gowdey's Estate, supra.

It should also be emphasized that the restrictions in the 1949 agreement were definite and did not remain to be determined from time to time. The power in the seller to determine restrictions from time to time seems to be the basis for the holding of the Ninth Circuit in Moberg on all but the ten-paragraph agreement.

The government has emphasized the fact that Jester did several things at Dinkins' request which were not mentioned in the contract such as conducting meetings, writing newsletters and supplying a mix formula. The court is convinced that these were not substantial rights which Jester had retained but were done at Dinkins' request in the hope that sales might thereby be increased. The court is also convinced that Jester had no vested right to do these things even if they were said to be substantial.

■ The court has carefully considered the contracts involved and the practices followed by the parties in operating under them against the background set forth herein and concludes that the 1949

Jester-Dinkins contract did in fact and law effectuate a sale of all Jester's substantial rights to the patent and trade name in the territory involved and that the revenue generated by that agreement should be treated as long term capital gain. This of course applies to the additional territory agreements which incorporated by reference the terms of the 1949 agreement.

The payments made to Jester on the establishment of each store and the payments based upon the quantity of mix sold are both found by the court to be consideration for the rights transferred and are to be treated alike.

As respects the contract entered into May 5, 1951 (Exhibit G) granting rights in additional areas of the state of New Jersey, the court concludes that Jester did not transfer all his substantial rights in and to the use of the patent and trade name.

As has been discussed, where the seller has the right to terminate the buyer's rights for reasons other than breaches of definitely stated conditions, he has not transferred all his substantial rights. In paragraph 10 of Exhibit G it is stated that "Buyer shall make every effort to secure the establishment of Dairy Queen stores within the above described territory at desirable locations until said territory has been fully developed." The seller is given the right to extinguish the buyer's right to further develop the territory in the event that the buyer defaults in the performance of any of the terms, conditions and provisions.

In this provision Jester retained rights to terminate which are inconsistent with a finding of sale. The standard is too indefinite. The seller could decide at any point that the buyer was not making "every effort" to establish stores until the territory is "fully developed" and exercise his power to terminate. The seller could do the same on his determination that the buyer was not using "*high grade* equipment, supplies, and mix, produced and distributed by *reputable* concerns" (paragraph 12) (emphasis added). If the seller firmly made such a

determination the most the buyer could do would be to force a judicial construction of these general and rather ambiguous terms.

It is to be noted that the buyer is not given time in which to correct the "breach" and save his rights as was the situation in some of the other contracts which have reached the courts.

It is therefore held that all the income generated by the May 5, 1951 agreement should be taxed as ordinary income.

Counsel will endeavor to agree upon the form of judgment to be entered herein and upon the computations to be made. In event of their inability to so agree they will submit in writing to the court their proposals as to the form of judgment.