**Vern H. MOBERG and Reta N. Moberg, Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 21874.**

United States Court of Appeals
Fifth Circuit.

Aug. 12, 1966.

Robert Ash, Charles H. Burton, Washington, D. C., Ash, Bauersfeld & Burton, Washington, D. C., of counsel, for petitioners.

Sheldon S. Cohen, Chief Counsel, I. R. S., Charles Owen Johnson, Atty., I. R. S., Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, David I. Granger, Crombie J. D. Garrett, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before RIVES, BROWN and MOORE,* Circuit Judges.

* Of the Second Circuit, sitting by designation.

MOORE, Circuit Judge:

On April 10, 1947, the petitioner Vern H. Moberg, in partnership with his brother Theodore E. Moberg, purchased from Hugh A. and John F. McCullough, the exclusive right to use patented Dairy Queen freezers in the States of Washington and Oregon, together with the right to grant sub-licenses in any portion of those States. In order to raise money for the effective exploitation of their franchise, the Moberg brothers in 1947, 1948 and 1949 granted subfranchises for various parts of those States to different people. Although the subfranchise contracts varied as to their terms, each provided for payment to the Mobergs of an agreed fixed amount—part of it in a cash down payment and part of it payable in installments, the timing of the installment payments being determined in part by the number of gallons of "mix" sold or used by the subfranchise holder. In addition to the agreed fixed payment, each contract provided that the Mobergs should be paid a certain number of cents per gallon of mix used "in the nature of a royalty", these gallonage payments to continue after the expiration of the patent on the freezer machines and to last "as long as no one else uses said freezers in said territory" or, in some contracts, as long as the subfranchise holder uses Dairy Queen freezers.

Vern H. Moberg and his wife Reta, the petitioners in the present case, filed joint federal income tax returns in Texas for the years 1948 and 1949, reporting the payments of the agreed fixed amounts as proceeds from the sale of capital assets, and the continuing gallonage payments as ordinary income. The Commissioner asserted that all of the payments should be treated as ordinary income. The Mobergs petitioned the Tax Court for a redetermination of the asserted deficiency, maintaining that both the continuing gallonage payments and the agreed fixed payments were entitled to capital gains treatment. The Tax Court held for the Commissioner on the theory that the proceeds were proceeds from license agreements and, therefore, ordinary income. 35 T.C. 773 (1961). On petition for review, we held that at least the agreed fixed payments were proceeds from the sale of assets (the subfranchises), and remanded so that the Tax Court could determine whether the subfranchises were held for sale in the ordinary course of business; whether the Mobergs could allocate a part of the cost of the master franchise to the subfranchises; and whether the gallonage payments not limited by a fixed dollar amount should be considered part of the sales price of the subfranchises. 305 F.2d 800 (5th Cir. 1962). The Tax Court on remand held that the subfranchises were capital assets, not held for sale in the ordinary course of business; permitted allocation of the cost of the master franchise; but held that the gallonage payments not limited by a fixed dollar amount should not be considered part of the sales price of the subfranchises, but should be treated as ordinary income. 22 CCH Tax Ct.Mem. 1483 (1963). Only this last determination is before us on the present appeal.

The Mobergs urge that the continuing gallonage payments should have been regarded as part of the proceeds of the sale of a capital asset. They point by way of analogy to a long line of cases in the patent area in which payments for the assignment of patent rights have been held entitled to capital gains treatment, even though the payments took the form of royalties per unit of the patented item used, and were spread out over a period of years. The most notable case in the line is Edward C. Myers, 6 T.C. 258 (1946), in which the Commissioner acquiesced as to the period 1946—June 1, 1950, 1946—1 Cum.Bull. 3, but withdrew his acquiescence for taxable years starting after June 1, 1950. Mim. 6490, 1950—1 Cum.Bull. 9. Congress attempted to deal with the problem legislatively in Section 1235 of the Internal Revenue Code of 1954, by providing that a transfer of all substantial rights to a patent, or of an undivided interest there-

in, shall be considered the sale or exchange of a capital asset:

(a) * * * regardless of whether or not payments in consideration of such transfer are—

(1) payable periodically over a period generally coterminous with the transferee's use of the patent, or

(2) contingent on the productivity, use, or disposition of the property transferred.

The Commissioner announced that he would continue to apply his 1950 ruling to taxable years beginning after May 31, 1950 and before January 1, 1954, Rev. Rul. 55–58, 1955—1 Cum.Bull. 97, but Congress amended the 1939 Code by adding subsection (q) to section 117, which essentially meant that provisions similar to those of § 1235 of the 1954 Code were to apply to taxable years beginning after May 31, 1950. For examples of cases similar to *Myers,* see Watson v. United States, 222 F.2d 689 (10th Cir. 1955); Coplan v. Commissioner of Internal Revenue, 28 T.C. 1189 (1957).

The Mobergs point to other cases outside the area of patent assignment which have held that continuing payments measured by use may be entitled to capital gains treatment. In Jones v. United States, 96 F.Supp. 973 (D.C.Colo.1951), aff'd, 194 F.2d 783 (10th Cir. 1952), the seller of a bus franchise was permitted to treat as capital gains a percentage of the gross receipts of the franchise sold, on the theory that that percentage constituted proceeds from the sale of a capital asset. In Dairy Queen of Oklahoma, Inc., 18 CCH Tax Ct.Mem. 322 (1959), in a case very similar on its facts to the present one, the Tax Court held that subfranchises sold by a Dairy Queen franchise holder were not assets held for sale in the ordinary course of business. However, it is not clear in that case whether the Tax Court considered as proceeds from the sale of capital assets the gallonage payments or only the lump sum payments under the sales contracts. In Wernentin v. United States, 218 F.Supp. 465 (S.D. Iowa 1963), again on facts very similar to the present case, the District Court held that where the seller of a Dairy Queen subfranchise was to receive a certain dollar amount for each store opened and 19 cents per gallon on all mix used by the subfranchisee, the gallonage payments were to be regarded as proceeds from the sale of a capital asset.

It should be noted, however, that the result of the *Wernentin* case does not follow automatically from the determination that the subfranchises sold were capital assets. Even if the subfranchises sold by the Mobergs were capital assets, all payments received under the subfranchise agreements are not necessarily proceeds from the sale of those capital assets. The continuing gallonage payments may be considered as the yield of a retained interest in the earnings of the subfranchises, rather than as the proceeds from the sale of the subfranchise—as if the Mobergs had sold most of their rights to exploit Dairy Queen freezers in a given area, but had retained a right to participate in the income from the purchaser's exploitation of that area. In short, there are two plausible interpretations of the role played by the continuing gallonage payments in the subfranchise agreements. It is our task to decide which of the two interpretations is more consistent with the expectations of the taxpayers and the policies underlying capital gains treatment.

The Mobergs themselves seem to have considered the continuing gallonage payments as a retained interest in earnings, rather than as part of the payment for rights transferred. In most of the subfranchise contracts, the continuing gallonage payments appear in a separate paragraph from the agreed fixed amount and are described as a "royalty". It is significant that the Mobergs in their original tax returns for the years in question reported the continuing gallonage payments as ordinary income. In the only Court of Appeals case which has discussed the tax treatment of continuing gallonage payments in similar Dairy Queen subfranchise contracts, Gowdey's Estate v. Commissioner of Internal Reve-

nue, 307 F.2d 816 (4th Cir. 1962), the court rested its holding that the continuing gallonage payments were ordinary income in part upon the fact that the grantor of the subfranchises had reported them as ordinary income in his tax returns.

It is also consistent with the policies underlying the distinction between capital gains and ordinary income to regard the continuing gallonage payments as the yield of a retained interest in future earnings. Section 1235 and its case-law predecessor, the *Myers* case, do not say that all periodic payments in a patent assignment are to be considered proceeds from the sale of a capital asset; they say rather that a transfer of patent rights may be a sale of a capital asset even though the consideration for the transfer is measured by use over a period of time. Those cases under § 1235 treating payments measured by use of the patented item as proceeds from the sale of a capital asset may be distinguished on the grounds that capital gains treatment may be necessary to stimulate exploitation of patents during the limited period of the patent grant—a policy not present here, where the gallonage payments were to extend beyond the life of the patents on the Dairy Queen freezer.

The longer the payments are spread out (here, for as long as the freezers are used or for as long as no one else uses the freezers in the assigned territory), the more the payments resemble a continuing interest in the earning capacity of the business transferred, and the less likely it is that treatment of the payments as ordinary income will work hardship. If, as the Supreme Court has said, Congress intended "to afford capital-gains treatment only in situations typically involving the realization of appreciation in value accrued over a substantial period of time, and thus to ameliorate the hardship of taxation of the entire gain in one year," Commissioner of Internal Revenue v. Gillette Motor Transport, 364 U.S. 130, 134, 80 S.Ct. 1497, 1500, 4 L.Ed.2d 1617 (1960), the facts of the present case do not call for capital gains treatment, since there is no danger of bunching of income.

Nor does capital gains treatment seem necessary in order to encourage investment and to insure the mobility of capital resources—the other purposes with which capital gains treatment is usually associated. See Comment, The Troubled Distinction Between Capital Gain and Ordinary Income, 73 Yale L.J. 693 (1964). The fact that the Mobergs were willing to sell the subfranchises even though they originally reported the continuing gallonage payments as ordinary income, indicates that capital gains treatment of such payments is not necessary to promote the sale and exploitation of subfranchises of the sort here involved.

On balance, we hold that the Tax Court did not err in treating the continuing gallonage payments as ordinary income rather than as proceeds from the sale of a capital asset. We also find support for our conclusion in the case of United States v. Witte, 306 F.2d 81 (5th Cir. 1962), cert denied, 371 U.S. 949, 83 S.Ct. 503, 9 L.Ed.2d 498 (1963). In that case, a seller of sand and gravel leases reserved as a royalty interest or production payment a percentage of the sand and gravel produced sufficient to yield $1,000,000.00. We held that that interest was one which had been retained by the seller so that proceeds from it constituted ordinary income, rather than being deferred payments of the purchase price entitled to capital gains treatment. The analogy to the present case is clear.

Affirmed.

JOHN R. BROWN, Circuit Judge (concurring):

I concur in the result and in most of what the Court says. I have, however, two specific reactions which I am unable to submerge.

The first is the dubious reliance on that very peculiar "economic interest"

concept as to the tax incidence of oil and gas transactions. (The Court cites United States v. Witte, 5 Cir., 1962, 306 F.2d 81, cert. den., 1963, 371 U.S. 949, 83 S.Ct. 503, 9 L.Ed.2d 498.) We have enough problems in confining this to depletable resources without bringing it in to offer a wholly new explanation to add to a dozen or so more which have come from all of the Judges who may not eat Dairy Queen, but find themselves dealing with it.

The second is to register some amazement that a time when all are encouraged to use inventive resourcefulness in finding ways to keep our vaunted judicial system from breaking down from its own weight as law collides with the explosion of population,[1] these contracts which are essentially the same have occupied the attention of so many Judges as they struggle a decade and half later, not merely to decide, but to decide upon what theory they are to decide, the tax consequences of Dairy Queen which probably "tastes good like Dairy Queen should," but which taxes good—to Taxpayer or Government alike—depending on the accident of residence. Judge Blackmun should now bring his penetrating analysis[2] up to date.

Individual litigation with one's own counsel, on one's own notion of the relevant record is dear to the heart of lawyers, but I would doubt that these issues have been sufficiently grave or important as to occupy the attention of no less than 18 Circuit Judges, one District Judge whose "extremely able decision" was last found to be both wrong and right, and an undisclosed number of Tax Court Judges.

Won't we have to find another, better way? If not, won't we, as this nation approaches the 300—350—400—million population, see a top heavy structure which fails in its aim from sheer weight?

---

1. See the address of the Chief Justice, American Law Institute, May 1965; Bros Inc. v. W. E. Grace Mfg. Co., 5 Cir., 1965, 351 F.2d 208, note 1, cert. den., 1966, 383 U.S. 936, 86 S.Ct. 1065, 15 L. Ed.2d 852.

2. United States v. Wernentin, 8 Cir., 1966, 354 F.2d 757, [Nos. 17633, 17688, 66–1 USTC 9140].