T.C. Memo. 2017-122

UNITED STATES TAX COURT

GREENTEAM MATERIALS RECOVERY FACILITY PN, GREENWASTE
RECOVERY, INC., TAX MATTERS PARTNER, ET AL.,[1] Petitioners <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 21946-09, 22233-09,      Filed June 21, 2017.
423-11.

<u>Kevin P. Courtney</u> and <u>William J. Mitchell</u>, for petitioners.

<u>Thomas R. Mackinson</u> and <u>Chong S. Hong</u>, for respondent.

---

[1] We consolidated with this case Greenteam of San Jose PN, Greenwaste Recovery, Inc., Tax Matters Partner, docket No. 22233-09; and Greenwaste of Tehama, PN, Zanker Road Resource Management, Ltd., a California Limited Partnership, Tax Matters Partner, docket No. 423-11. We allowed the parties to file separate briefs.

**[*2]**      MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, <u>Judge</u>:  In 2003 a California partnership called Greenwaste of Tehama sold its waste-collection business in Tehama County and the City of Red Bluff to Waste Connections, Inc. for $8 million.  That same year, two related partnerships called Greenteam of San Jose and Greenteam Materials Recovery Facility (Greenteam Facility) also sold the assets of their businesses in the City of San Jose to Waste Connections for $38 million.  The sales included both tangible and intangible assets.  The parties settled the tax treatment of the sales of these assets, except for one--the contractual rights to provide waste-collection services to these local governments.

The Greenteam partnerships say that these contracts were franchises, and that the Code has a special rule that taxes the sale of franchises at the favored capital-gains rates.  The Commissioner doesn't believe that section applies.  He wants us to sift through decades of caselaw where we ourselves separated sales of contracts that produced capital income from sales of contracts that produced ordinary income.

[*3]                         FINDINGS OF FACT

A.      Greenwaste of Tehama

Greenwaste of Tehama was formed in 1997 to bid on what the waste and recycling business calls a request for proposal (RFP) from Tehama County and the City of Red Bluff to take care of their waste and recycling needs.  Neither Red Bluff nor Tehama County kept good records for this sort of thing, so Greenwaste of Tehama employees dug through what records there were and talked to the city and county regulators--a chore that took months.  Greenwaste of Tehama engineers also had to figure out what permits were required, and what it was going to take to put the whole waste and recycling business together.  This was hard work, and Greenwaste of Tehama spent about $100,000 to put together its bid.

In California the winner of an RFP typically gets the exclusive right to manage a city's waste and recycling for a fixed term--usually seven to ten years.  It's not unusual for contracts to be renewed though, and businesses like Greenwaste of Tehama will often assume their contract will be renewed when they put together their RFP.  Calculating how much it will cost to manage a city's waste and recycling demands can also be tricky.  A business must consider a variety of costs--including the need for buildings and trucks--before it submits a final number.

**[\*4]**   Greenwaste of Tehama's heavy lifting paid off, and it beat out a number of other bidders.  What it won was a package of five contracts.  Two contracts gave Greenwaste of Tehama the exclusive right to collect and dispose of all of Tehama County's recyclables and its residential and commercial waste.  Two contracts gave Greenwaste of Tehama the same right to Red Bluff's recyclables and its residential and commercial waste, and the company agreed to provide any equipment like carts and bins.  The fifth contract wasn't to collect garbage but to dump it:  Greenwaste of Tehama got the exclusive right to use the Tehama County-Red Bluff landfill to get rid of what it picked up.  As part of this contract, Greenwaste of Tehama also agreed to pay for any needed improvements at the landfill, even though title to these improvements would revert to Tehama County and Red Bluff when the contract ended.

The Tehama collection contracts started running in the summer of 1998, and the Red Bluff collection contracts started later that year.  All four contracts ran through June 2007, but could be extended by mutual agreement.  The parties agree that in 2003 the four collection contracts were collectively worth $866,500 and the landfill contract was worth $1,024,500.

[*5] B.　　The San Jose Partnerships

The Greenteam of San Jose deal was similar. Back in 1991 San Jose also issued an RFP for waste disposal and recycling services for single-family homes. A few months later it issued a similar RFP for multifamily residences. Greenteam of San Jose was formed to bid on these RFPs. Like Greenwaste of Tehama, Greenteam of San Jose spent a good deal of time and money to put together its bids, and even hired outside consultants. San Jose is the unofficial capital of Silicon Valley, so it is no surprise that Greenteam of San Jose incorporated some innovative tech in its bid for this ancient work: It attached an RFID (radio frequency identification) tag to every trash bin so Greenteam of San Jose could track when and where trash was collected. It also was the first waste collection company to put computers in its garbage trucks to monitor collection, and Greenteam developed the necessary software itself. Greenteam of San Jose even experimented with different types of vehicles before it found one that was both productive and efficient enough to meet its obligations to San Jose.

This all went very well, and Greenteam of San Jose won the contracts in the summer of 1992. These contracts ran through 1999, but could be extended for up to three years. Much as with Greenwaste of Tehama's, Greenteam of San Jose's contracts required it to collect and dispose of residential waste and recyclables in

**[*6]** one section of San Jose. But it also had to build a processing facility to sort and store recyclables and keep San Jose's recyclables separate from those of others. To meet this requirement, Greenteam of San Jose formed Greenteam Facility. Greenteam of San Jose did a good job, and when San Jose issued another RFP in 2000, it won the bid again.

C.     Waste Connections

In 2002 a company called Chaparral Group LLC, a consulting group for the waste industry, asked the Greenteam partnerships if they would be willing to sell. They were. That summer the Greenteam partnerships signed a consulting agreement with Chaparral, and Chaparral quickly put together a package that estimated potential sale prices. Things moved quickly, and by that fall the Greenteam partnerships had signed a letter of intent to negotiate with the highest bidder--Waste Connections.

In the fall of 2003, the Greenteam partnerships officially sold their assets to Waste Connections. Greenwaste of Tehama's was an all-cash deal for $8 million. With a very minor exception, Greenwaste of Tehama didn't keep any interest in the Tehama County and Red Bluff contracts.[2] The asset-purchase agreement allocated:

---

[2] The only asset not included was a single truck.

[*7]  ● $22,000 to a covenant not to compete,

● $1,201,000 to tangible assets,

● $345,000 to buildings, and

● $90,000 to land.

Waste Connections' deal with Greenteam of San Jose and Greenteam Facility was very similar.  It too was all cash and a sale of substantially all its assets--including the San Jose contracts--for a lump sum of $40 million (later reduced to $38 million).  There were no contingent payments.  Greenteam of San Jose didn't keep any interest in the San Jose contracts either.  The asset-purchase agreement allocated:

● $123,000 to a covenant not to compete, and

● $9,187,000 to land, buildings, and equipment.

D.    Tax Reporting of the Deals

On its 2003 tax return Greenwaste of Tehama reported the values of the covenant not to compete and the tangible assets the same way the parties allocated them in the Tehama asset-purchase agreement.  That left $6,342,000, which Greenwaste of Tehama reported as goodwill, to be taxed at capital-gains rates.  Greenteam of San Jose and Greenteam Facility had to divide up the amounts

**[*8]** allocated in their asset-purchase agreement to their respective returns.

Greenteam of San Jose reported:

- $102,000 for a covenant not to compete,

- $8,813,000 for land, buildings, and equipment, and

- $22,727,000--its remainder--for goodwill and going-concern value.[3]

Likewise, Greenteam Facility reported:

- $21,000 for a covenant not to compete,

- $374,000 for land, buildings, and equipment, and

- $6,086,000--its remainder--for goodwill and going-concern value.

To summarize:

---

[3] As a technical matter this means that Greenteam of San Jose reported $8,813,000 from the transfer of a class V asset and $22,727,000 from the transfer of class VI and VII assets on its Form 8594, Asset Acquisition Statement under Section 1060. Greenteam Facility reported its values similarly on its return. The IRS instructions for Form 8594 tell us what these classes mean. Class V assets are all assets that are not class I through IV assets (cash, actively traded personal property, assets the taxpayer markets-to-market, and stock), or class VI and VII assets. Class VI assets are section 197 intangibles, except for goodwill and going-concern value, which are separately classified as class VII assets.

| [*9]            Item | Greenwaste of Tehama | Greenteam of San Jose | Greenteam Facility |
|---|---|---|---|
| Covenant not to compete | $22,000 | $102,000 | $21,000 |
| Tangible assets | 1,636,000 | 8,813,000 | 374,000 |
| Goodwill/going concern | 6,342,000 | 22,727,000 | [1]6,086,000 |

[1]We note the sum of Greenwaste of Tehama's covenant not to compete, the tangible assets, and the goodwill/going concern--$22,000 + $1,636,000 + $6,342,000--is $8,000,000, which was the purchase price in its asset-purchase agreement.  Similarly, the sum of Greenteam of San Jose and Greenteam Facility's tangible assets and goodwill/going concern--$8,813,000 + $22,727,000 + $374,000 + $6,086,000--is $38,000,000, which was the purchase price in their asset-purchase agreement.

Everything seemed fine until the Commissioner showed up in 2009, audited the returns under TEFRA, and issued notices of final partnership administrative adjustment (FPAA) recharacterizing the gains from the contracts as ordinary income.[4]  For the 2003 tax year, he sent Greenwaste of Tehama an FPAA

---

[4] TEFRA is the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, 96 Stat. 324, one part of which governs the tax treatment and audit procedures for most partnerships.  See TEFRA secs. 401-406, 96 Stat. at 648-671.  TEFRA partnerships are subject to special tax and audit rules.  See secs. 6221-6234.  Each TEFRA partnership, for example, is supposed to designate a tax matters partner to handle the partnership's administrative issues with the IRS and any resulting litigation.  TEFRA requires the uniform treatment of all "partnership items"--a term defined by section 6231(a)(3) and (4)--and its general goal is to have a single point of adjustment for the IRS rather than having it make separate partnership item adjustments on each partner's individual return.  See H.R. Conf. Rept. No. 97-760, at 599-601 (1982), 1982-2 C.B. 600, 662-63.  If the IRS decides to adjust any partnership items on a partnership return, it must notify the

(continued...)

[*10] recharacterizing $6,890,000 as ordinary income,[5] Greenteam of San Jose an

FPAA recharacterizing $20,222,000 as ordinary income,[6] and Greenteam Facility

an FPAA recharacterizing $6,278,000 as ordinary income.[7] The partnerships all

filed timely petitions disputing the Commissioner's recharacterizations.[8] Most

_____

[4](...continued)
individual partners of the adjustment by issuing an FPAA. Sec. 6223(a). An FPAA generally includes: (1) a notice of final partnership administrative adjustment, (2) Form 870-PT, Agreement for Partnership Items and Partnership Level Determinations as to Penalties, Additions to Tax, and Additional Amounts, including a Schedule of Adjustments, and (3) an explanation of adjustments, listing the Commissioner's other adjustments or determinations.

(All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.)

[5] Of this amount, $6,342,000 was related to the sale to Waste Connections and the remaining $548,000 was related to other expenses.

[6] Greenteam of San Jose's FPAA recharacterized the entire amount reported on its Form 4797, Sales of Business Property. The $20,222,000 is the amount of tangible assets and goodwill/going concern allocated to Greenteam Facility ($31,540,000) minus the amount for its covenant not to compete ($102,000) minus its adjusted basis in the assets ($8,166,000) and an adjustment for depreciation ($3,050,000).

[7] Greenteam Facility's FPAA likewise recharacterized the entire amount reported on its Form 4797. The $6,278,000 is the amount of tangible assets and goodwill/going concern allocated to Greenteam Facility ($6,460,000) minus the amount for its covenant not to compete ($21,000) minus its adjusted basis in the assets ($142,000) and an adjustment for depreciation ($19,000).

[8] Because the partnerships' principal places of business were in California

(continued...)

**[*11]** issues were resolved through stipulation and settlement, but there's one issue left--whether the Greenteam partnerships recognized capital gains or ordinary income when they sold the contracts to Waste Connections. The parties fought at first about the values of these contract rights but before trial stipulated that the total value of Waste Connections' agreement with Greenwaste of Tehama was $1,891,000; the value of its agreement with Greenteam of San Jose was $13,576,700; and the value of its agreement with Greenteam Facility was $2,780,800.

## OPINION

The Greenteam partnerships' argument is simple. The sales of the contracts fall under section 1253, which says that a taxpayer gets capital-gains treatment when it sells a "franchise" unless it has a continuing interest in the franchise after the transfer. The Commissioner disagrees. He thinks section 1253 doesn't apply precisely because the Greenteam partnerships didn't keep any interests in the contracts and didn't receive any contingent payments. The Commissioner says that since section 1253 doesn't apply, we have to decide whether the contracts were capital assets by looking at section 1221, the six-part multiprong test of <u>Foy</u>

---

[8](...continued)
when they filed their petitions, these cases are presumptively appealable to the Ninth Circuit. <u>See</u> sec. 7482(b)(1)(E).

[*12] v. Commissioner, 84 T.C. 50 (1985), and the substitute-for-ordinary-income doctrine.  The Greenteam partnerships think they still win under Foy.

I.      Whether the Contracts Were "Franchises"

The first question we must answer is whether the contracts the Greenteam partnerships sold were "franchises" under section 1253.  Section 1253 says that a transfer of a franchise, trademark, or trade name may not be treated as a sale or exchange of a capital asset if the transferor retains any significant power, right, or continuing interest in the franchise, trademark, or trade name.  Sec. 1253(a).  Section 1253(b)(1) defines "franchise" for the purposes of that section:

> Franchise.--The term "franchise" includes an agreement which gives one of the parties to the agreement the right to distribute, sell, or provide goods, services, or facilities, within a specified area.

The definition is unambiguous, so we need only look at the plain language of the statute.  Tele-Commc'ns, Inc. v. Commissioner, 12 F.3d 1005, 1006 (10th Cir. 1993), aff'g 95 T.C. 495 (1990); Jefferson-Pilot Corp. & Subs. v. Commissioner, 995 F.2d 530, 531 (4th Cir. 1993), aff'g 98 T.C. 435 (1992).  Section 1253(b)(1) tells us that there's a "franchise" for the purposes of section 1253 if there is:

**[\*13]** ● an agreement

    ● in which one party receives the right to provide services

    ● within a defined area.

See Tele-Commc'ns, 95 T.C. at 509. If a transaction satisfies these three requirements, then it falls under section 1253. Id.

We directly addressed this issue in Tele-Communications. In that case we found that prospective cable operators had to sign an agreement with a local government to construct and operate a cable franchise. Id. at 498-99. Such agreements typically lasted between ten and fifteen years, and required the operators to pay the local government a percentage of their revenue and promise to maintain certain construction standards, air certain programming, and open local offices with regular business hours. Id. at 499-501. But if they did so, the operators got a *de facto* territorial monopoly. Id. at 502. Tele-Communications was a major cable operator that had bought three such cable systems from another cable operator. Id. at 496-497.

The issue in Tele-Communications was whether those franchises were "franchises" under section 1253. Id. at 495. The Commissioner argued that they weren't because they were granted by the local government, and that the legislative history of section 1253 showed that Congress intended the section to

[*14] apply only to private franchises. Id. at 511. We disagreed and held that the definition of "franchise" was broad, unambiguous, and applied to the franchises Tele-Communications bought. We focused on the nonexclusive term "includes" in section 1253(b)(1), and reasoned that Congress would not have used that term if it had meant for section 1253(b)(1) to be applied narrowly. Id. at 514. The Tenth Circuit affirmed our decision. See Tele-Commc'ns, 12 F.3d 1005. The Fourth Circuit also followed our reasoning. See Jefferson-Pilot, 995 F.2d 530 (holding that "franchise" included a FCC license under section 1253(b)(1)).

We won't disrupt this consensus, and find that the Greenteam contracts meet the definition in section 1253(b)(1).[9] The contracts were agreements to provide services--specifically landfill, waste-disposal, and recycling services. These services had to be performed within specific areas. The Greenwaste of Tehama contracts had to be performed in Tehama County and Red Bluff, and the Greenteam of San Jose contracts had to be performed in San Jose.

The Commissioner, however, has a new argument: He argues that "franchise" in the California waste and recycling industry means only a contract

---

[9] Even the Commissioner seems to concede in portions of his briefs that the contracts meet the definition of "franchise" under section 1253(b)(1). He wrote: "[T]he GWT Contracts appear to meet the section 1253(b) definition of 'franchise,' but that is irrelevant."

[*15] that continues to renew until it's terminated. The industry, contends the Commissioner, calls only these "evergreen" contracts "franchises". When a contract between a company and a local government is to provide specific services for a limited time (usually between 7 and 10 years), it is instead a "municipal contract." The Commissioner says that the California waste and recycling industry would classify these contracts as municipal contracts, so they can't be "franchises" under section 1253.

The Commissioner's problem is that the industry definition in California doesn't matter for federal income-tax purposes. See Tele-Commc'ns, 95 T.C. at 510 ("The important consideration is the substance of the taxpayer's activity and whether it falls within the definition of the Code, not the form or labels placed upon the activity."). Section 1253 specifically defines "franchise", and that's the definition we have to use.

Holding that section 1253 includes the contracts here as "franchises" isn't the end of the matter. We also need to figure out whether the Greenteam partnerships kept any "significant power, right, or continuing interest" in the franchises. If they did, their income from the sales is ordinary. See sec. 1253(a), (b)(2); see also Rev. Rul. 88-24, 1988-1 C.B. 306. But that's an easy question here--none of the Greenteam partnerships kept any interest in the franchises, and

**[\*16]** they didn't receive contingent payments--they got lump-sum payments. Even the Commissioner concedes in his briefs that the partnerships didn't hold onto any significant interests in the franchises or receive contingent payments. Since we are dealing with franchises under section 1253, and the partnerships didn't keep any interests in the franchises or receive contingent payments, we know the transactions aren't ineligible for capital-gains treatment. See sec. 1253(a).

II.    Capital Gains Treatment

Now we must decide how to read the rest of section 1253. The Greenteam partnerships argue that not getting kicked out of section 1253(a) automatically entitles them to capital-gains treatment. But section 1253(a) says what *doesn't* get capital gains treatment, not specifically what does. The Commissioner says this means section 1253 is inapplicable by its own terms, so the transactions are taxed as ordinary income. A closer look at the whole section resolves this issue though. Section 1253(d) talks about capital accounts. Paragraph (2) says:

> Any amount paid or incurred on account of a transfer, sale, or other disposition of a franchise, trademark, or trade name to which paragraph (1) does not apply shall be treated as an amount chargeable to *capital account*. [Emphasis added.]

**[*17]** This implies that the sale of a franchise leads to capital gains, unless the transaction is specifically knocked out of section 1253 by section 1253(a).

Our Court has already addressed this issue too. In <u>Jackson v. Commissioner</u>, 86 T.C. 492, 520 (1986), <u>aff'd</u>, 864 F.2d 1521 (10th Cir. 1989), we held that section 1253 gives a transferor of a franchise capital-gains treatment so long as it doesn't retain any significant interest in the franchise and the franchise was a capital asset. The Fifth Circuit agrees. It also explained that section 1253(a) says a taxpayer doesn't get capital-gains treatment when it transfers a franchise if it retains a significant interest in the franchise. <u>McIngvale v. Commissioner</u>, 936 F.2d 833, 839 (5th Cir. 1991), <u>aff'g</u> T.C. Memo. 1990-340. <u>McIngvale</u> also said that section 1253 assumes the inverse too--when a taxpayer transfers a franchise and *doesn't* retain a significant interest, the transaction is taxed as the sale or exchange of a capital asset. <u>Id.</u>[10]

---

[10] The legislative history of section 1253 confirms the courts' interpretation. Congress originally passed section 1253 to deal with conflicting caselaw surrounding the question of whether payments from a franchisee to a franchisor qualified for capital-gains treatment. <u>See</u> S. Rept. No. 91-552 (1969), 1969 U.S.C.C.A.N. 2027, 2241-2246; <u>see also, e.g.</u>, <u>Moberg v. Commissioner</u>, 365 F.2d 337 (5th Cir. 1966), <u>aff'g</u> 35 T.C. 773 (1961), <u>and</u> T.C. Memo. 1963-288; <u>United States v. Wernentin</u>, 354 F.2d 757 (8th Cir. 1965); <u>Estate of Gowdey v. Commissioner</u>, 307 F.2d 816 (4th Cir. 1962), <u>rev'g</u> T.C. Memo. 1961-112; <u>Dairy Queen of Okla., Inc. v. Commissioner</u>, 250 F.2d 503 (10th Cir. 1957) <u>rev'g</u> 26 T.C. 61 (1956).

**[*18]**  We won't disrupt this consensus either.  Section 1253 applies to the transactions because the taxpayers here kept no significant interest in the contracts they sold.  Caselaw then tells us that this entitles them to capital-gains treatment on their profits from the sales.  This means that we need not discuss the Commissioner's arguments that the franchises weren't capital assets under section 1221 and the Foy test, or under the substitute-for-ordinary-income doctrine.

Decisions will be entered under

Rule 155.
