George C. and Angela B., McINGVALE, Sr., Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

No. 90–4698
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

July 30, 1991.

D. Kevin McCorkingdale, Tobolowsky, Prager & Schlinger, Dallas, Tex., for petitioners-appellants.

Abraham N.M. Shashy, Jr., Chief Counsel, I.R.S., Gary R. Allen, Chief, Curtis C. Pett, Kenneth L. Greene, Sara S. Holderness, Appellate Section, Shirley D. Peterson, Asst. Atty. Gen., Tax Div., U.S. Dept. of Justice, Washington, D.C., for respondent-appellee.

Before JOHNSON, SMITH and WIENER, Circuit Judges.

WIENER, Circuit Judge:

This kaleidoscopic federal income tax case was filed in the United States Tax Court by Petitioners–Appellants George C. and Angela B. McIngvale (collectively, Taxpayers) against the Commissioner of Internal Revenue (the Commissioner) for a redetermination of federal income tax deficiencies previously determined by the Internal Revenue Service (IRS). Following a trial on the merits, the tax court ruled in favor of the Commissioner, holding that (1) Taxpayers had failed to meet their burden of proof to support a claimed reduction of $15,000 for overstatement of income, and (2) Taxpayers' 1978 loss, incurred in connection with their interest in a Nautilus franchise transferred in 1974 to their children's corporation in consideration of that corporation's grant of a private annuity which became worthless in 1978, was governed by the annuity provisions of 26 U.S.C. 72 (hereafter Section 72 of the Internal Revenue Code (I.R.C.) of 1954, as amended), and not by the franchise provisions of I.R.C. § 1253, so that the loss sustained by the Taxpayers was a capital loss rather than an ordinary loss under I.R.C. § 165. On appeal, Taxpayers claim that the tax court clearly erred in its factual determination regarding the $15,000 item, and erred as a matter of law in failing to apply I.R.C. § 1253 to Taxpayers' franchise loss to produce ordinary loss, or alternatively in failing to allow ordinary loss treatment under I.R.C. § 165.

Concluding that the tax court was not clearly erroneous in finding Taxpayers' evidence insufficient to overcome the presumption of correctness of the deficiency determination of the IRS, we affirm the tax court's refusal to reverse the $15,000 determination. Likewise concluding that the tax court correctly analyzed Taxpayers' loss that resulted from the failure of their children's corporation as a loss on the annuity that Taxpayers acquired when the franchise was transferred to the corporation— and thus a capital loss—rather than either an ordinary loss on "licensing" of franchise rights under I.R.C. § 1253 or an ordinary loss under I.R.C. § 165(a), we affirm the tax court's holding on that issue as well.

## I.

## OPERABLE FACTS

Early in 1974, Mr. McIngvale acquired rights to market exercise equipment manufactured by Nautilus (the franchise) in prescribed geographical areas. The franchise cost Mr. McIngvale $209,439. Realizing that his involuntary bankruptcy was imminent and wishing to insulate the franchise from his bankruptcy, Mr. McIngvale arranged for the incorporation of Nautilus of the Southwest, Inc. (Nautilus Southwest) on May 3, 1974, all capital stock of which was acquired equally by Taxpayers' six children as original owners. Just days later, on May 14, 1974, shortly before he was involuntarily placed in bankruptcy, Mr. McIngvale assigned and transferred the franchise to Nautilus Southwest in consideration for which the corporation assumed Mr. McIngvale's present and future obligations under the franchise and contracted to pay Mrs. McIngvale $4,000 a month for the rest of her life, beginning on or before January 1, 1976 (the private annuity). When, shortly thereafter, Mr. McIngvale was involuntarily placed in bankruptcy, he listed neither the franchise or any rights or interests in it, nor his wife's private annuity, on the schedule of assets he filed with the bankruptcy court.

Although Mr. McIngvale was employed and served as general manager of Nautilus Southwest from its incorporation in 1974 through its bankruptcy in 1978, with responsibility for sales, management and employee training, there is no evidence that he personally retained rights to license other parties as Nautilus franchisees or sub-franchisees. Nautilus Southwest obtained all right, title and interest in the franchise from Mr. McIngvale in exchange for the private annuity granted to Mrs. McIngvale for life.

Nautilus Southwest paid Mrs. McIngvale $48,000 in 1976 and a like amount in 1977, which Taxpayers reported on their joint income tax returns as "proceeds from the sale of Nautilus franchises" offsetting an equal amount of their investment (basis) in the franchise. A subsequent audit by the IRS, however, determined that such reporting was improper under I.R.C. § 72. The return position for those payments under I.R.C. § 72, as proposed by the IRS, was accepted by Taxpayers.

In 1978 Nautilus Southwest declared bankruptcy, paying only $16,000 to Mrs. McIngvale that year. Taxpayers claimed an ordinary loss of $193,367 on their 1978 income tax return, being the amount of their remaining investment (basis) in the private annuity. Taxpayers also amended their returns for 1976 and 1977, claiming an ordinary loss carryback.

In 1977, the IRS determined that the Taxpayers' $193,367 loss was capital rather than ordinary, on the basis of which the IRS determined deficiencies of $30,455 and $36,900 for 1976 and 1978, respectively. An additional tax of $9,155.75 was imposed for 1978 pursuant to I.R.C. § 6651 for Taxpayers' failure to file a timely return. Taxpayers concede that if they are liable for a deficiency for 1978 the additional tax is proper.

## II.

### PROCEEDINGS

The foregoing facts are straightforward and undisputed; the same cannot be said for the procedural history of this case, during which the Taxpayers and the Commissioner repeatedly changed their respective positions. In October of 1987, Taxpayers filed their original petition in tax court seeking a redetermination of the IRS's deficiency determination for 1976 and 1978, claiming that the annuity became worthless upon the bankruptcy of Nautilus Southwest in 1978, thereby producing an ordinary loss in the amount of Taxpayers' remaining basis in the franchise. They claimed that the ordinary loss created a net operating loss for 1978 that could be carried back to 1976.

Late in 1988, Taxpayers amended their petition, asserting that the receipt of the annuity by Mrs. McIngvale was a closed transaction requiring Taxpayers to recognize capital gain in 1974 in the amount by which the present value of the annuity exceeded the investment in the annuity. The Taxpayers further claimed that the amounts received under the annuity reduced their investment in it so that when Nautilus Southwest became bankrupt in 1978, Taxpayers became entitled to an ordinary loss in the amount of their unrecovered investment.

In March of 1989, Taxpayers' January 30, 1989, motion was granted, permitting them to amend their petition again. For the first time Taxpayers advanced the argument that the transfer of the franchise should be governed by I.R.C. § 1253 which provided that under specified circumstances the transfer of a franchise would not be treated as a sale or exchange of a capital asset; as a result of which, i.e., absent a sale or exchange, the transfer would give rise to ordinary gain or loss rather than capital gain or loss.

This case was tried to the tax court in November of 1989, when, for the first time, Taxpayers contested the $15,000 item. That was the amount reported as income on Schedule C of their 1978 return as "Additional—To Offset Any Other Income Which Might Be Included by the IRS." At trial Taxpayers insisted that no such item was ever received so the amount should not have been included on the return.

In January of 1990, the due date of Taxpayers' post-trial brief, the Commissioner

sought to amend his Answer to conform with Taxpayers' trial testimony which indicated that the franchise had substantial value after the bankruptcy of Nautilus Southwest in 1978; that Taxpayers suffered no loss in 1978; and that their tax deficiency was greater than previously known. The tax court denied the Commissioner's motion to amend as being prejudicial to Taxpayers.

Finally, late in May of 1990, the Commissioner raised yet another theory: that Mr. McIngvale made a gift to Mrs. McIngvale in 1974 when *he* transferred the franchise in exchange for the private annuity payable to *her* for life, eschewing loss between related parties under I.R.C. § 267. The tax court refused to consider that tardy theory.

Although Mr. McIngvale testified that the $15,000 entry did not represent income received in 1978, he could not explain the presence of the entry on the return, and the return preparer was not present at trial. The tax court found that the unsupported conclusory testimony of McIngvale was insufficient to support reduction of 1978 income by $15,000, but allowed Taxpayers the opportunity to make their 1978 return preparer available for an interview with the IRS, after which the tax court would accept a stipulation regarding the $15,000. No such stipulation was ever submitted to the court.

The tax court also found that Taxpayers had transferred their entire interest in the franchise to Nautilus Southwest in 1974 in exchange for a private annuity, and that the annuity became worthless in 1978 as a result of that corporation's bankruptcy. On those facts the tax court held that the annuity provisions of I.R.C. § 72, not the franchise provisions of § 1253, governed the treatment of Taxpayers' loss, concluding that the Taxpayers had sustained a capital loss rather than an ordinary loss. Taxpayers timely filed a notice of appeal.

## III.

## ANALYSIS

*A. Standard of Review.*

■ Our standard of review for appeals from the United States Tax Court is the same as for appeals from the district court: We review findings of fact for clear error and legal conclusions *de novo*. The determination of whether a loss is capital or ordinary is a conclusion of law. *Dresser Industries, Inc. v. Comm'r*, 911 F.2d 1128, 1132 (5th Cir.1990).

*B. $15,000 Reduction in Taxable Income.*

■ As noted above, the issue of the $15,000 item of income on Schedule C of the Taxpayers' 1978 return was raised for the first time at trial when Mr. McIngvale testified that he had never received that item of income. Rather, he stated, the accountant who prepared the tax return for that year had inserted that entry, and he (McIngvale) did not know why. In the absence of testimony by the return preparer, and failing to obtain the stipulation that the court proposed, the tax court found that Taxpayers' evidence was insufficient to carry their burden of proving that the $15,000 item was incorrectly reported as income on their tax return. The tax court classified the $15,000 entry as an admission that there may have been other income for which Taxpayers had failed to account. We infer from the tax court's finding that Mr. McIngvale's testimony on this item was not found worthy of credit. His contention that his testimony was sufficient to shift the burden back to the IRS is without merit. We affirm the tax court's holding against Taxpayers on this point.

*C. Transfer of Franchises for Private Annuity: I.R.C. § 72 or § 1253?*

■ Taxpayers insist that the transfer of the franchise is governed by Section 1253 of the Code, stating correctly that the franchise meets I.R.C. § 1253's definition of franchise. Crucial to Taxpayers' position, however, is whether Mr. McIngvale, as transferor, "retain[ed] any significant power, right, or continuing interest with respect to the subject matter of the franchise...." I.R.C. § 1253(a). Taxpayers proffered testimony of an oral agreement between Nautilus Southwest and Mr.

McIngvale obligating him to serve as general manager of the transferee corporation and be involved in sales promotion, sales management and other economic activities. The parties stipulated that Mr. McIngvale was employed by Nautilus Southwest as general manager from the date of transfer until bankruptcy of the corporation; that he was responsible for sales management and employee training; that he acted as store manager for several of the stores; and that he was responsible for opening stores.

Taxpayers insist that such evidence proves that Mr. McIngvale, as transferor, in fact exercised the type of control contemplated by Congress in enacting I.R.C. § 1253—that the transferor retain significant powers, rights and continuing interests in the subject matter of the franchise after the transfer of the franchises to the transferee.

The gravamen of Taxpayers' argument is that when, pursuant to I.R.C. § 1253, a franchise is transferred under circumstances in which the transferor retains significant power, right or continuing interest, such transfer should be treated as a "license" and not as a sale or exchange. Also crucial to Taxpayers' case is their argument that their loss on the purported license transaction occurred as a result of the worthlessness of the franchise, not as a result of the transferee ("licensee") corporation's becoming bankrupt and ceasing to pay the private annuity. Taxpayers insist that the franchise, in which Mr. McIngvale allegedly retained interest and control pursuant to I.R.C. § 1253, was the source of the loss when it (the franchise) became worthless, positing that the loss thus produced was on an asset used in Taxpayers' trade or business, or alternatively that the loss at least occurred in a transaction entered into for profit; and that under either theory the loss was deductible as an ordinary loss under I.R.C. § 165, subsection 165(f) to the contrary notwithstanding.

Ingenious as Taxpayers' ever-changing arguments may be, they are unavailing. For purposes of the instant analysis, this court assumes, as we infer the tax court did, that the uncontroverted testimony of Taxpayers concerning the oral understanding between Mr. McIngvale and Nautilus Southwest is true, as is the evidence of his employment by that corporation to serve as its general manager and essentially run the business of the corporation. Even so, the conclusion is inescapable, as implied in the opinion of the tax court, that the type of power, control and interest enjoyed by Mr. McIngvale as an executive employee of his children's transferee corporation, bears no resemblance whatsoever to the type of power, right or interest that I.R.C. § 1253(a) requires the transferor to retain in order for that section to eschew the occurrence of a sale or exchange of a capital asset. "Significant power, right or continuing interest" is defined in I.R.C. § 1253(b)(2) by an illustrative, nonexclusive list of six types of powers, rights and interests contemplated by I.R.C. § 1253. *See* I.R.C. § 1253(b)(2).[1]

Even a cursory examination of the six illustrative types of significant powers, rights or continuing interests demonstrates that I.R.C. § 1253 is referring to the types of interests that a continuing franchisor retains when granting franchises to his franchisees. Under those circumstances, the type of franchise granted by the franchisor is more akin to a license than a capital asset. The Taxpayers' problem here, however, is that Mr. McIngvale did not grant one or more franchises to Nauti-

---

**1.** (A) A right to disapprove any assignment of such interest, or any part thereof.

(B) A right to terminate at will.

(C) A right to prescribe the standard of quality of products used or sold, or of services furnished, and of the equipment and facilities used to promote such products or services.

(D) A right to require that the transferee sell or advertise only products or services of the transferor.

(E) A right to require that the transferee purchase substantially all of his supplies and equipment from the transferor.

(F) A right to payment contingent on the productivity, use or disposition of the subject matter of the interest transferred, if such payments constitute a substantial element under the transfer agreement.

lus Southwest in the sense of licensing that corporation to be in the business, in designated geographical areas, of selling Nautilus equipment. Instead, Taxpayers made a total transfer to the corporation of all right, title and interest in the franchise, as a result of which the corporation stepped totally into the shoes of the Taxpayers. The Taxpayers retained nothing; the consideration for divesting themselves of the role of "big Nautilus's" franchise and substituting the corporation as the new franchisee (or, conceivably, sub-franchisor to third parties) was the private annuity to Mrs. McIngvale.

Equally implicit in the tax court's decision was its finding that whatever powers, rights or continuing interests Mr. McIngvale exercised by virtue of being general manager and conducting the business of Nautilus Southwest, they were powers, rights or continuing interests *of the transferee corporation* and not of Mr. McIngvale. No powers which might have been held and exercised by Mr. McIngvale individually were analogous to the types of retained power, right or continuing interest illustrated in I.R.C. § 1253(b)(2)(A)–(F).

Without quibbling about the meaning or significance of the word "retains," it suffices that the powers and interests I.R.C. § 1253 lists in defining "significant power, right or continuing interest," and any others that the imagination might conceive as being analogous to those, were held exclusively by the transferee corporation, Nautilus Southwest, from eleven days following its incorporation until its bankruptcy. Any right of Mr. McIngvale to exercise such powers, rights, or interests resulted from his employment as general manager of the transferee corporation, not from his individual capacity as the transferor. Had it been otherwise, he certainly would have listed those retained rights in his personal bankruptcy or risked charges of bankruptcy fraud.

The record is devoid of evidence that Mr. McIngvale did anything less than transfer his entire right, title and interest in the franchise to Nautilus Southwest on May 14, 1974, as found by the tax court. There was no typical franchise (licensing) agreement to Nautilus Southwest as franchisee; no written or oral agreement acknowledging that Mr. McIngvale retained or obtained powers of the nature listed in I.R.C. §§ 1253(b)(2)(A)–(F); no evidence that Mr. McIngvale individually could grant other franchises (licenses) within the territory of the subject franchise. Conversely, the record contains ample support for the conclusion that on May 14, 1974, Mr. McIngvale sold or exchanged the franchise in toto. His proven motivation for the transfer was to insulate the franchise entirely from his anticipated bankruptcy. The sworn list of assets he furnished the bankruptcy court mentioned nothing about the franchise or any retained powers of the nature listed in I.R.C. § 1253. On the other hand, his children's corporation apparently exercised at least some of the types of retained powers listed illustratively in I.R.C. §§ 1253(b)(2)(A)–(F) during the period of more than two years when Mr. McIngvale was running the corporation as its general manager.

Although an explication might have been helpful on appeal, the tax court was not required to set forth in detail the foregoing analysis in the body of its memorandum opinion. That omission is understandable given the tax court's direct ruling that there was no loss on the exchange of the franchise for the annuity in 1974, but only a capital loss on the worthlessness or abandonment of the annuity when the obligor corporation became bankrupt in 1978. Nevertheless, the tax court's discussion of the evidence, rejection of the Taxpayers' argument, and square holding that the 1974 transfer of the franchise from Mr. McIngvale to Nautilus Southwest was a sale or exchange of a capital asset rather than the licensing of franchise rights to a franchisee, implies beyond cavil that the tax court found that the powers exercised and interest "retained" by Mr. McIngvale in his children's corporation were unlike the "significant power, right, or continuing interest" defined in I.R.C. § 1253. Moreover, as this case was fully tried, and evidence adduced, including fact stipulations by the parties, this court could and does

find the same facts found inferentially by the tax court. A remand for such findings is unnecessary.

 Finally, Taxpayers contend that "[e]ven if the Court determines that the transfer of the franchises is to be treated as a sale or exchange of a noncapital asset under § 1253 and that the rules of § 72 do apply, the character of the loss arising out of the discontinuance of the annuity payments is referable to the transfer of the franchises. Thus, the loss must be treated as a loss from the sale or exchange of a noncapital asset." That alternative proposition too is unavailing. First, I.R.C. § 1253(a) states the general rule that "[a] transfer of a franchise ... shall not be treated as a sale or exchange of a capital asset if the transferor retains any significant power, right, or continuing interest...." That statement is pregnant with the negative that when, in a transaction otherwise taxable as a sale or exchange of a capital asset, the transferor does *not* retain any significant power, right or interest in the franchise, its transfer *shall* be treated as a sale or exchange of a capital asset. As determined by the tax court and affirmed by this court, Taxpayers were totally divested of the franchise by virtue of the May 14, 1974, transfer to Nautilus Southwest. The sale or exchange of the franchise was properly characterized by the IRS as a result of its audit of Taxpayers' returns for 1976 and 1977 as the sale of a capital asset. That correction was accepted by the Taxpayers and voluntarily followed by them for 1978 as well. The Taxpayers, however, attempted to change their position by reporting the amount unrecovered on the private annuity pursuant to I.R.C. § 72 as an ordinary loss rather than a capital loss. Any deduction under I.R.C. § 165(f) would be capital as well.

But most importantly, the tax court determined, and we agree, that the Taxpayers' loss in 1978 was a loss on the *annuity,* not the franchise, and that the loss resulted from the bankruptcy of Nautilus Southwest as the obligor on the annuity, not from the worthlessness or abandonment of the franchise (which we gather was ulti-mately transferred to a third party through the bankruptcy of the obligor corporation, presumably (but not significantly) for value).

## CONCLUSION

For the reasons set forth above, the judgment of the tax court rejecting Taxpayers' contentions regarding the $15,000 item of additional income and holding that Taxpayers' loss in 1978 was a capital loss on the private annuity, and not, as insisted by Taxpayers, an ordinary loss on the remaining basis in the franchise transferred in 1974, is

AFFIRMED.