United States Court of Appeals,

Fifth Circuit.

No. 93-5594.

ESTATE OF Herbert R. CAVENAUGH, Deceased, William Monroe Kerr, Independent Administrator, Petitioner-Appellant

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

May 10, 1995.

Appeal from A Decision of the United States Tax Court.

Before JONES and DeMOSS, Circuit Judges, and TRIMBLE[*], District Judge.

EDITH H. JONES, Circuit Judge:

The Estate of Herbert Cavenaugh invested considerable intellectual and creative resources to minimize its tax liability. It excluded the value of property Herbert received upon the death of his first wife Mary Jane because of the technical possibility that he might not be entitled to all of the income from the property, and it excluded half of the life insurance proceeds paid on his death to the estate, asserting that Texas law still recognized Mary Jane's community interest in the proceeds. Unimpressed by the estate's acumen, the Commissioner of Internal Revenue assessed a hefty deficiency. Imputing the full value of both of these interests to Herbert's estate, the Tax Court upheld the Commissioner's calculation of tax due. See 100 T.C. 407, 1993 WL 153230 (1993). This court accepts the essential propriety of

---

[*]District Judge of the Western District of Louisiana, sitting by designation.

1

that court's interpretation of the federal tax code but affirms the judgment only as to Herbert's interest in the residuary trust created by Mary Jane's will. We reverse the portion of the deficiency attributable to the life insurance policy because the IRS misread Texas community property law.

## I.

The relevant facts are uncomplicated. Herbert and Mary Jane Cavenaugh were married for many years and resided in Texas, a community property state. In 1980, they purchased a renewable term life insurance policy on Herbert's life. In 1983, Mary Jane died testate; her will left Herbert certain property interests which he—as executor of her estate—elected to exclude from her gross estate as property eligible for the Marital Deduction.

In 1986, Herbert died, leaving his estate as sole beneficiary of approximately $650,000 in life insurance proceeds. His estate—the appellant here—excluded from Herbert's gross estate one-half of the term life insurance death benefit paid to the estate and those property interests that had passed from Mary Jane to Herbert on her death in 1983.

## II.

### The QTIP Deduction

Section 2001 of the Internal Revenue Code imposes a tax on each decedent's taxable estate. The taxable estate equals the value of the gross estate, which consists of all property owned by the taxpayer upon death, less applicable deductions. Upon Mary Jane's death in 1983, Herbert, as executor of the estate, elected

2

to exclude from the gross estate the value of certain properties transferred to him by virtue of her will. Section 2056(a) now authorizes an unlimited (in dollars) deduction from the decedent's gross estate of property transferred to a surviving spouse. Often referred to as the "Marital Deduction," this provision postpones taxation on such property until the surviving spouse disposes of the exempted property by gratuitous transfer, whether inter vivos or at death. See *Estate of Clayton v. C.I.R.,* 976 F.2d 1486, 1492 (5th Cir.1992).

To ensure that none of this property escapes taxation, section 2056(b) provides an exception to subsection (a)'s grant of an unlimited Marital Deduction for "terminable interests." Code section 2056(b) excludes "terminable" interests[1] in property from eligibility for the Marital Deduction. But a number of particular exceptions to this general terminable interest exception are recognized; among the particular types of terminable interests that are in fact deductible by virtue of being exceptions-to-the-exception is the Qualified Terminable Interest Property ("QTIP") created by the Congress in 1981. Subsection 2056(b)(7)(B)(i) defines QTIP as property (i) which passes from the decedent, (ii) in which the surviving spouse has a qualifying income interest for life, and (iii) to which an election to exclude is made. An election to claim a marital deduction for qualified

_____

[1]These are defined as interests which will terminate or fail on the lapse of time, the occurrence of an event or contingency, or on the failure of an event or contingency to occur. See § 2056(b)(1).

3

terminable interest property once made is irrevocable. Section 2056(b)(7)(B)(v).

Herbert exercised such an election on behalf of Mary Jane's estate in 1983 and accordingly excluded the properties at issue here from her gross estate. Nevertheless, Herbert's estate now claims that this election was unavailable since the transferred property was ineligible for QTIP treatment. Hence the estate attempts to circumvent Section 2044(a), which requires inclusion in Herbert's estate of the value of all property in which the decedent had a qualifying interest for life.

The estate advances two arguments why the initial election was defective: (1) The income interest that Herbert received could not constitute a "qualifying income interest for life;" (2) Mary Jane's will precluded the executor, Herbert, from exercising the necessary election. This second theory, however, collapses into the first argument since section 2044 defines petitioner's tax liability independently of the constraints of Mary Jane's will. Specifically, this section requires the inclusion of the property in Herbert's gross estate if the "decedent had a qualifying income interest for life" when "a deduction was allowed with respect to the transfer of such property to the decedent." Since there is no dispute that such a deduction was allowed by the Commissioner, whether the property received by Herbert was a qualifying income interest for life becomes dispositive. The viability of a QTIP election, in other words, presents a question of federal, not state law, and such an election, once made and approved by IRS, is

4

irrevocable.

This court reviews *de novo* the Tax Court's conclusion that this property did qualify. *McIngvale v. Commissioner,* 936 F.2d 833, 835-36 (5th Cir.1991). A qualifying income interest for life is a defined term of art for an interest in which "the surviving spouse is entitled to all the income ... payable annually or at more frequent intervals .. [and of which] no person has a power to appoint any part of the property to any person other than surviving spouse." *Estate of Clayton,* 976 F.2d at 1496 (quoting § 2056(b)(7)(B)(ii)(II)) (alterations in original). Consequently, the statute imposes two definitional elements: (1) Herbert must be entitled to *all* of the income; and (2) no person can be authorized to appoint any part of the property to anybody but Herbert. These determinations must be made as of the date of Mrs. Cavenaugh's death. *Id.* at 1497. Applicable regulations incorporate state law to determine whether the income distribution requirements are satisfied. Treas.Reg. § 20.2056(b)-5(e).

Herbert received two types of interests in property. Mary Jane bequeathed him specifically defined interests in their home and other real property.[2] Her will also created a residuary trust whose net income was to be paid to Herbert during his lifetime only. Only Herbert's interest in the residuary trust is at issue in this appeal.

_____

[2]Mrs. Cavenaugh's will assigns Herbert a life estate in the family home, but permitted him the power to sell it provided that the interest from such sale was invested in another home for Dr. Cavenaugh with any balance of her interest to be added to her estate's residuary trust.

5

Herbert's estate and the IRS part company over the scope of his interest as a beneficiary of the residuary trust. The precise question is whether Herbert was entitled to receive all of the income during his life. Herbert's estate contends that since no provision of Mary Jane's will nor of Texas law[3] precludes the accumulation of trust income (as opposed to its distribution currently to Herbert), the possibility existed that some of this income might go to Mary Jane's descendants (the Cavenaugh children) upon Herbert's death. Thus, it urges the QTIP deduction's statutory requirement that Herbert be entitled to all of the income of the residuary trust payable at least annually might not be satisfied. Moreover, the trustee by resort to accumulation is also technically authorized to appoint part of this property to somebody other than Herbert.

Fortunately, this court need not enter the fray between the Ninth Circuit in *Estate of Howard v. Commissioner,* 910 F.2d 633 (1990), and the Tax Court in *Estate of Shelfer v. Commissioner,* 103 T.C. 10, 1994 WL 373509, 1994 U.S.Tax Ct. LEXIS 50 (1994) (refusing to follow *Estate of Howard* since Shelfer resides in Eleventh Circuit), in determining whether a technical possibility that *any* income will not go to the surviving spouse destroys eligibility for QTIP treatment.[4] The significance petitioner derives from the lack

_____

[3]The parties agree that the nature of the interest Herbert received is decided under Texas law.

[4]In any event, Judge Wiener's opinion in *Estate of Clayton,* 976 F.2d at 1497, cites the *Estate of Howard* opinion approvingly.

of an express prohibition on accumulation (in either the will or under Texas law) is misplaced. Whether the surviving spouse is entitled to all the income is not measured by an abstract principle of law but merely by reference to the decedent's intent. See generally *Estate of Clayton,* 976 F.2d at 1488-1490 (eligibility for QTIP measured by reference to four corners of will); *Perfect Union Lodge No. 10 v. Interfirst Bank,* 748 S.W.2d 218 (Tex.1988) (wills are construed to give effect to the actual intention of the testator). In other words, whether Mary Jane intended that Herbert receive all of the income from these property interests and whether she did—or did not—authorize any other person to appoint part of this property to somebody other than her spouse is dispositive.

"The cardinal rule for construing a will requires that the testator's intent be ascertained by looking to the provisions of the instrument as a whole." *Id.* The best evidence the estate identifies that Mary Jane did not intend for Herbert to receive all of the income in at least annual intervals is Paragraph B of Article V of her will. That paragraph requires that the net income from the trust be paid to Herbert for as long as he lives "*monthly* or at the end of such other periods as may be necessary or desirable in the discretion of the Trustee." (emphasis added). Herbert's estate reasons that Mary Jane thus imposed on the trustee "no limitations on its discretion to distribute" and thereby "left to the professional trustee all of the considerations and decisions about how much and when distributions of income should be made." Although this provision plainly provides the trustee with some

7

latitude in determining when income distributions should be made, reading that clause to manifest an intent to permit the trustee to exercise absolute discretion in choosing when to pay income to Dr. Cavenaugh is unwarranted.

To begin, the will specifically states that the payments of income should be made periodically. Normally, a trustee is required to make payments of income at reasonable intervals. Bogert, TRUSTS AND TRUSTEES, § 814 (2d ed. 1981). A reasonable interval is ordinarily semiannually or quarterly. 2A Scott, TRUSTS, § 182, at 550 (4th ed. 1987). If anything, the inclusion of "monthly" evinces an intent to distribute the income at more frequent intervals than "reasonableness" requires.

Resort to the reading advanced by the estate would render the word "monthly" wholly meaningless. Texas presumes that a testator would not include useless expressions in her will. *Republic National Bank v. Fredericks,* 155 Tex. 79, 283 S.W.2d 39, 44 (1955).

Notably, no authorization in the will exists for the trustee to accumulate income during Herbert's life, and Mary Jane interestingly neglected to provide for the disposition of accumulated income. In contrast, Mary Jane did explicitly provide that *after* Herbert's death income could be accumulated and added to the trust corpus and that the trustee shall have "sole and absolute discretion" to distribute income and corpus to her children.

Finally, paragraph D of Article V of the will gives Herbert the express right to withdraw the greater of $5,000 or five percent of the corpus of the residuary trust in any calendar year.

Presumably, the trust settlor intends that the trust income be distributed before corpus is invaded. Since Herbert is entitled to require distributions of corpus annually, it is unlikely that Mary Jane did not intend to entitle him to distributions of income as often. Taken cumulatively, it is easy to conclude that Herbert's estate was compelled to include the value of his interest in the trust, already made the subject of a QTIP election on Mary Jane's estate tax return, in its return.

## III.

### Life Insurance Proceeds

The conflict between the Commissioner and the Estate over the proper taxation of term life insurance proceeds paid to Herbert's estate raises a much closer question. Internal Revenue Code § 2042(1) dictates that "the value of the gross estate shall include * * * the amount receivable by the executor as insurance under policies on the life of the decedent." Section 20.2042-1(b)(2) of the Regulations, however, excludes life insurance proceeds payable to the estate to the extent that they belong to the decedent's spouse under state community property law. Herbert's estate labors to avail itself of this exception by insisting that one-half of the $650,000 proceeds still belonged to Mary Jane's residuary trust.[5] Although the Commissioner ridicules this argument as "pure metaphysics," the truth of the matter is decided under state law. *Broday v. United States,* 455 F.2d 1097, 1099 (5th Cir.1972).

---

[5]Her executor did not specifically include any interest in the insurance policy in the gross estate.

9

Therein lies the rub.

In Texas, the status of property is fixed at the time of acquisition or inception of title. *Colden v. Alexander,* 141 Tex. 134, 171 S.W.2d 328, 334 (1943). Since Herbert's term life insurance policy was purchased initially with community property in 1980, ordinarily Mary Jane would retain a one-half community interest in the policy and its proceeds: "[I]f life insurance is purchased during a marriage and paid for with community funds, the "policy rights' or incidents of ownership and the "proceeds rights' or the rights to receive the proceeds in the future constitute community property." *Freedman v. United States,* 382 F.2d 742, 745 (5th Cir.1967), citing *Brown v. Lee,* 371 S.W.2d 694 (Tex.1963). Two factual wrinkles obscure this simplicity: (1) Mary Jane died in 1983; (2) Herbert personally had to renew the policy in 1984, 1985 and 1986.

Prompted by these complications, the IRS fires three broadside assaults on the suggestion that Mary Jane[6] continued to sustain an unmatured interest in the proceeds. First, the IRS posits that because the marital community dissolved at her death any community interest in the policy or unmatured right to the proceeds terminated upon expiration of the last one-year term of the policy paid with community funds. Alternatively, the Commissioner argues that Texas caps Mary Jane's community interest at one-half the cash surrender or interpolated terminal reserve value of the policy at

---

[6]Or the residuary trust created by her estate.

10

her death.[7]  As the term policy here had no cash surrender value nor any value computed by the interpolated terminal reserve method, the Commissioner reasons the remaining $650,000 of value must be ascribed to Herbert's estate.  The final challenge recasts the lack of monetary value at the moment of her death into an extirpating force.  The Commissioner explains that the absence of monetary value removed the need for partition of Mary Jane's community interest in the policy, thereby transforming Mary Jane's communal right into an "extinguished" interest.

"Under circumstances where the uninsured spouse predeceases the insured spouse, settlement of the decedent's community interest in the unmatured chose has *ordinarily* been resolved by allocating one-half of the cash surrender value to the deceased's estate and the other one-half ... to the surviving spouse." *Brown v. Lee,* 371 S.W.2d 694, 696 (1963) (emphasis added).  Significantly, however, Mary Jane's property was not settled or partitioned prior to Herbert's death.  Accordingly, the normal rule of *Brown* is inverted:  "[W]here settlement of the deceased wife's community interest in the policies was not made prior to the death of the insured ... the wife's community interest was never extinguished and the policies retained their community status up to the time of

---

[7]*Estate of Wien v. Commissioner,* 441 F.2d 32, 34 (5th Cir.1971), requires that the value of Mary Jane's community interest in the policy be determined at the date of her death. This unexceptionable principle is hardly probative in answering whether Mary Jane's residuary trust preserved an interest in a speculative investment vehicle that ultimately produced a sizeable return on account of the occurrence of a contingency, *i.e.* Herbert's death while covered.

maturity. Consequently, the proceeds are community." *Id.*

Elaborating on the consequences of treating life insurance purchased by the community as community property, *Amason v. Franklin Life Insurance Co.,* 428 F.2d 1144 (5th Cir.1970), provides a mandatory lesson on the treatment of insurance proceeds received after the dissolution of the marital community where no partition has yet occurred. The case holds explicitly that divorce does not "automatically divest either spouse of his or her interest in the policy," that this interest is preserved in both benefits of ownership of the policy *and* the eventual proceeds from the policy, and that the need to pay premiums subsequent to the divorce from separate funds cannot terminate either spouse's right to the proceeds. *Id.* at 1146-1148. Furthermore, *Amason* prescribes the tenancy-in-common as the proper prism to assess the legal relationship. *Id.* at 1147 ("After divorce each spouse owns an undivided one-half interest in that property as a tenant in common in the same fashion as if they had never been married.")

Hence *Amason* instructs that the death of Mary Jane without a partition created a tenancy-in-common between Mr. Cavenaugh and her estate's designated heirs vis à vis the policy.[8] Moreover, this tenant in common relationship continues until the proceeds are paid. Nonetheless, persuasively distinguishing death from divorce or adopting a limiting principle in cases where the policy has no cash value at the moment of the uninsured spouse's death would

---

[8]This is true at least until the term covered by the prior payment of a premium expires.

12

still permit the Commissioner to prevail.  Yet previous resort to these exact maneuvers failed to capture any bounty for the Internal Revenue Service.  *See Scott v. Commissioner,* 374 F.2d 154, 159-160 (9th Cir.1967).

In *Scott,* a remarkably similar case[9], the precise question tackled by the court was how much of the insurance proceeds the husband must include in his estate.  Critically, the cash surrender value of the policy at the date of the wife's death was zero.  Interestingly, the Commissioner advanced a familiar logic:

> [The wife's] only interest at her death, and therefore the only interest that passed ... under her will was the right to receive one-half of the cash surrender value of the policies. The theory ... is that while the insured husband is alive the only value that can be realized is the cash surrender value, and that the right to receive the face amount of the policies upon the husband's death ... is kept alive only by payment of further premiums by the husband after the wife's death. Consequently to the extent that the proceeds receivable at the husband's death exceed the cash surrender value at the wife's death, this is attributable to those premiums, which were not paid from community property the marital community having been dissolved by the death of the wife.  Accordingly, the entire proceeds, less one-half the cash surrender value at the time of the wife's death, are part of the husband's estate.

*Id.* at 159.  Dismissing this argument, the Ninth Circuit recognized that under California community property law, "the right to have the contract of insurance continued in force by virtue of payment of premiums from its issuance" is itself a "valuable right" even when the policy at dissolution has no cash surrender value.  *Id.* at

---

[9]There the wife also predeceased the insured husband, her estate had similarly listed zero value of the policy in its earlier return, the husband and named beneficiaries had paid more than $4,000 in additional premiums to prevent the policy from lapsing after the wife's death, and his estate claimed only half the value of the proceeds in its gross estate.

159-160. The question in California law was not whether the community interest in the life insurance policy lapsed after the death of the uninsured spouse but was instead the proportion of ownership attributable to the uninsured spouse's estate.

Although the community property laws of California and Texas differ in many respects, neither the IRS nor the Tax Court has produced authority confirming a meaningful variation between California and Texas law on this issue. Specifically, *Scott's* treatment of a marital community dissolved via death—construction of a tenant in common relationship—accords with the solution to dissolution adopted by *Amason* in the context of divorce. This parallelism is not only logical, but appears compelled by the synergy of *Amason* and *Brown v. Lee.*[10]

Furthermore, *Scott* 's holding that the community interest is not commuted by a zero cash surrender value harmonizes with Texas law. "Even though the policy provides only for term insurance and has no cash value, it is still a property right." *Seaman v. Seaman,* 756 S.W.2d 56, 58 (Tex.App.1988) (citation omitted). The contrary position of the IRS conflates "value" with a "property interest." Within and without Texas, property is distinct from value; surely one can own property that is worthless by any market measure, but still is not subject to confiscation by the state or

---

[10]Recall that Brown held that the community interest of the *deceased* uninsured wife in the proceeds was not extinguished *sans* partition or laches. *Brown,* 371 S.W.2d at 696.

14

invasion by other members of the public.[11]

Mitchell v. Mitchell, 448 S.W.2d 807, 811 (Tex.App.1969), does not hold otherwise. That case resolved a dispute between the original wife and the second wife of the deceased over an interest in the proceeds of his federal group life insurance policy. Applying federal law, the court concluded that the first wife could have no interest in the policy because the federal statute strictly assigned all interests to the "widow." *Id.* Preservation of a community interest in the coverage afforded by the federal policy would violate the conditions of the federal statute. Citing this court, *Mitchell* observed: "The words "payable' and "widow' * * * in the * * * statute do not refer to the status of the beneficiary at the time the policy * * * is issued and the beneficiary is designated, but are clearly applicable to the status of the beneficiary when the policy matures and becomes due and payable." *Id.* (alterations in original). To effectuate this design, the *Mitchell* court held that "the term "widow' clearly means [only] the woman surviving on the death of the man to whom she was legally married at the time of his death." Thus, the original wife's interest was truncated by operation of the statute and not because of its lack of cash value.

Now confronted by the Commissioner's final bolt, this court

---

[11]To illustrate in the term insurance context, consider a policy "worthless" as measured by cash surrender or interpolated reserve value. If the insured could no longer obtain insurance for health or other eligibility reasons, the right to renewal at a set annual premium would suddenly represent considerable value.

15

must divine whether each yearly renewal of a one-year term life insurance policy by means of increasing premiums creates a (new) separate policy or continues to relate to the initial (communal) investment. Because Texas follows the inception of title doctrine, the choice is binary: If the community received all of what it bargained for in the original policy while Mary Jane lived, the post-communal renewals are separate property, but if elements of the contract remained unexpired at Mary Jane's death then the community interest survives. Examining the terms of the policy discloses several guarantees of more than *de minimis* import to the community's transaction.

A. The Cavenaughs purchased the unrestricted right to renew the policy for a period of up to 21 years at a fixed (albeit increasing) rate. The security of this protection is compounded by two provisions that expressly permit exercise of this right "without proof of insurability" and entitle the owner of the policy to "automatic conversion" to any whole life insurance policy issued by the insurer. In economic terms, the Cavenaughs negotiated a one-year term life insurance policy plus an option with a defined—and lengthy—exercise period. This option alone might suffice to track the coverage afforded by the later renewals back to the community. See *Demler v. Demler,* 836 S.W.2d 696 (Tex.App.1992) (options earned during marriage were community property).

B. The policy also became uncontestable after two years and no longer excluded payment upon suicide of the insured.

16

C. The annual dividends (of at least 3.5%) payable to the Cavenaughs increase in a non-linear progression as the policy is renewed for extended terms. For example, in year 1 of the policy the Cavenaughs were scheduled to receive $2,730, for the second year $2,379, and the fourth year $2,944.50. But by renewing the policy through year 10, they could expect to receive $5,726.50 annually and by year 15 the return would jump to $8,970. Hence the financial terms of subsequent renewals for one-year increments were not completely independent. By continuing coverage after Mary Jane's death, Mr. Cavenaugh apparently reaped some benefit from the four years of prior insurance.

Taking these factors together, we believe it unlikely that a Texas court would dismiss these benefits produced by the community as trivial. Employing the time of acquisition rule, Mr. Cavenaugh's later actions could not therefore convert the character of the property.

In the absence of any argument or evidence by the IRS that might justify assigning less than one-half of the proceeds to Mary Jane's unpartitioned community interest, we see no basis to deviate from applying the conventional principles of Texas community property law to the proceeds. Accordingly, the Tax Court erred in determining that Herbert's estate should include for tax purposes 100% of the proceeds of the term life insurance purchased initially by the community. The tax liability must be recalculated,

17

attributing one-half of the proceeds to his estate.[12]

For the foregoing reasons, the judgment of the United States Tax Court is AFFIRMED in part, and REVERSED in part.

DeMOSS, Circuit Judge, specially concurring and dissenting:

I concur fully with the rationale, reasoning and conclusion set forth in Part II of the panel opinion relating to the appropriateness of, and the enforceability of, the QTIP election made by Herbert in his capacity as independent executor of the estate of his first wife, Mary Jane. I also concur with the panel's reasoning and analysis set forth in Part III, Life Insurance Proceeds, of the foregoing opinion, in so far as such opinion concludes: (i) that prior to her death, Mary Jane had a community property interest in the term life insurance policy which was taken out during her marriage to Herbert, which insured Herbert's life and which was payable to "the estate of the insured"; and (ii) that, contrary to the contentions urged by the

---

[12]Judge DeMoss's dissent argues forcefully that all of the life insurance proceeds should have been included in Herbert's estate either because of the impact of the QTIP election, which requires inclusion of property subject to that election in the estate of the later-deceased spouse, and/or because exclusion of the proceeds from Herbert's estate does not comport with § 2042 of the Internal Revenue Code, implemented by Treas.Reg. § 20.2042-1(b)(2). Neither of these theories was advanced by IRS in this court or made a basis for the Tax Court's decision. We are loathe to speculate, much less rule on the propriety of arguments that neither competent counsel nor a specialist court employed. Moreover, the dissent's QTIP-founded theory of taxing the entire life insurance proceeds in Herbert's estate seems to conflict with the parties' stipulation that if the residuary trust property subject to Article V of Mary Jane's will should be included in Herbert's estate because of the QTIP election, its value is $43,254.00. This stipulation would appear to render the dissent's reliance on § 2056 less attractive to IRS.

18

Commissioner, dissolution of the marital community between Herbert and Mary Jane did not automatically terminate Mary Jane's interest in the policy; Mary Jane's interest in the policy was not limited to one-half the cash surrender value or interpolated terminal reserve value thereof at her death; and the lack of monetary value in the policy at the moment of her death did not result in an "extinguishment" of her interest.

I part company with my distinguished colleagues in concluding that the foregoing determinations were sufficient to demonstrate that the Tax Court erred in holding that Herbert's estate should include 100% of the proceeds of the life insurance policy. I reach the contrary conclusion based on either or both of the following reasons:

(1) Section 2044 of the Internal Revenue Code mandates that a decedents estate must include the value of any property as to which a valid QTIP election under Section 2056(b)(7) was made; and

(2) Section 2042 of the Internal Revenue Codes mandates that a life insurance policy made payable to the estate of the decedent must be included in the gross estate of the decedent, and the requirements of Treasury Regulation Section 20.2042-1(b)(2) are not satisfied in this case.

I write now to set forth the supporting analysis for these reasons.

SECTION 2044 MANDATES INCLUSION OF QTIP PROPERTY

The community property interest which Mary Jane owned in the life insurance policy on Herbert's life during their marriage was inheritable under the intestate succession statute of Texas or devisable under the terms of her will. Mary Jane did leave a will which was admitted to probate and Article V of that will is a true

19

residuary disposition by which Mary Jane devised "all of the rest and residue of the property which I may own at the time of my death, whether real, personal or mixed, and wherever situated" to the trustee of the trust created under Article V. Consequently, after Mary Jane's death, the life insurance policy on Herbert's life was owned 50% by Herbert as his separate estate and 50% by the trust created under Article V of her will. Under the terms of Mary Jane's will, Herbert was a lifetime beneficiary of the trust created under Article V; and we have concluded in Part II of the panel opinion that Herbert had sufficient income rights in the property in Article V to make such property eligible for a QTIP election. In his capacity as independent executor, Herbert expressly elected to treat all of the assets passing under Mary Jane's will, including expressly those passing under Article V, as being covered by the QTIP election and no estate taxes were due and owing therefore on Mary Jane's estate. The basic concept of the marital deduction under Section 2056(a) in general and a QTIP election under Section 2056(b)(7) is a postponement of (an not an exemption from) estate taxes at the time of the death of the first spouse to die. Likewise, Congress intended by passage of Section 2044 that upon the death of the second spouse the gross estate of the second spouse "shall include the value of any property in which the decedent [the second spouse] had a qualifying income interest for life." Note that the definition says that it is the value of the "property" not the value of the "qualifying income interest for life." For example, suppose husband and wife owned as community

20

property a piece of commercial property on which the improvements were subject to a long term lease to a national tenant. Wife dies leaving a will which devises her one-half interest in the property to a trust of which her husband is a beneficiary for his life for all of the income from the property and upon his death the trust continues for the benefit of their children. Upon the wife's death a QTIP election is exercised as to this property and no portion of the value of that property is included for tax purposes in the wife's estate. Upon the subsequent death of the husband, his gross estate must include the value of the wife's interest in the property, not just the value of his lifetime revenue interest. Therefore, it seems clear to me that in the case before us, the value of the life insurance on Herbert's life (the property) as to which Herbert (the decedent) had a qualifying income interest for life as the beneficiary of the trust under Article V of Mary Jane's will, must now be included in Herbert's estate for tax purposes.

PROCEEDS OF LIFE INSURANCE UNDER SECTION 2042

It is stipulated in this case that the life insurance policy on Herbert's life was payable to "the estate of the insured." The express terms of Section 2042 therefore mandate that the proceeds of such policy are includable as part of the gross estate of Herbert's estate. The only possible grounds upon which Herbert's estate could avoid the inclusion of 100% of the insurance proceeds would be to demonstrate that the circumstances defined in Treasury Regulation Section 20.2042-1(b)(2) were applicable. This regulation states:

21

(2) If the proceeds of an insurance policy made payable to the decedent's estate *are community assets under the local community property law* and, as a result, *one-half of the proceeds belongs to the decedent's spouse,* then only one-half of the proceeds is considered to be receivable by or for the benefit decedent's estate.  (Emphasis added)

As the panel majority indicates in the first paragraph of Section III of their opinion, "Herbert's estate labors to avail itself of this exception by insisting that one-half of the $650,000 proceeds still belong to Mary Jane's residuary trust."  The panel majority then proceeds to demonstrate (accurately in my opinion) why the grounds asserted by the Commissioner to defeat the position asserted by Herbert's estate missed their mark and are not themselves sufficient to support the conclusion of the tax court that 100% of the insurance proceeds had to be included in Herbert's estate.  However, nowhere does the panel majority address the satisfaction of the requirements of the Treasury Regulation quoted above, and in my view on the basis of the record in this case, there is no way those requirements can be met.

First of all, there are serious definition problems which Herbert's estate cannot satisfy.  After the death of Mary Jane (which terminated the community estate between Herbert and Mary Jane) the life insurance policy was no longer a "community asset" but rather it was an asset of the tenancy in common between the separate estate of Herbert as to 50% and the trust created under Article V of Mary Jane's will as to 50%.  Note that the Regulation says "*are* community assets" not "*were* community assets." Consequently, the proceeds of that policy when made payable by the occurrence of Herbert's death were payable 50% to Herbert's

22

separate estate and 50% to the trust under Article V of Mary Jane's will. Satisfaction of the requirements of the Regulation is further complicated by the factual circumstance that Herbert had remarried and at the time of his death, his second wife, Cindy, was his "spouse." There is nothing in the record whatsoever to demonstrate that Cindy ever acquired any interest from any source in the life insurance policy on Herbert's life. Consequently, none of the policy proceeds belongs to "the decedent's spouse." I see nothing in the regulations which would permit us to construe the term "the decedent's spouse" to mean "a trust created under the will of a former spouse." Since the statute (Section 2042) mandates the inclusion in the decedent's gross estate of "the amount receivable by the executor as insurance under policies on the life of the decedent," the burden would be upon Herbert's estate to demonstrate its entitlement to the exclusion contemplated by the Treasury Regulation; and since neither the facts nor the legal concepts permit that to be done, I think we are obligated to affirm the decision of the tax court requiring the inclusion of 100% of the life insurance proceeds even though we do not agree with the grounds or reasons upon which the tax court arrived at that conclusion.

Accordingly, I dissent from the conclusion of the panel majority requiring a recalculation of the tax liability "attributing [only] one-half of the proceeds of the insurance policy to Herbert's estate."